UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**FILED**

APR 0 7 2000

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| PETER H. BURKE, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>HAROLD RUTTENBERG, et al.,<br><br>Defendants; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CV 99-BU-3097-S

**ENTERED**

APR 0 7 2000

| | |
|---|---|
| GEORGE W. MASSEY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>HAROLD RUTTENBERG, et al.,<br><br>Defendants; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CV 99-BU-3129-S

## Memorandum Opinion

The present consolidated actions involve claims of securities fraud in the purchase and sale of common stock of Just for Feet, Inc., ("Just for Feet" or "Feet") proscribed by section 10(b) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78j(b) and

124

Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5; claims of aiding and abetting violation of the Exchange Act in contravention of section 20 of the Exchange Act, 15 U.S.C. § 78t; and claims of insider trading prohibited by section 20A of the Exchange Act, 15 U.S.C. § 78t-1. Claims of fraud and professional negligence arising out of the same purchase and sale of Just for Feet common stock are raised under the law of the State of Alabama. There exists jurisdiction over the federal claims in these actions pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331. Supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 is asserted.

Pending before the Court are the motions of competing parties, the State of Wisconsin Investment Board ("SWIB") and the self-styled "Just for Feet Plaintiffs Group" ("the Group"), for appointment as lead plaintiff in the instant securities fraud action pursuant to section 21D(a)(3)(B)(i) of the Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 ("the Reform Act"), 15 U.S.C. § 78u-4.[1] The Court's original conclusion, after reviewing the materials initally filed by the contenders for the lead plaintiff position, was that each contender had advantages and disadvantages with regard to issues of typicality, adequacy, cohesiveness and amount of loss and that, as a consequence, the Court should flip a coin to decide who to appoint lead plaintiff. Rather than toss a coin in the privacy of chambers and inform the parties of its decision

---

[1] The original motion of SWIB to be appointed lead plaintiff in the instant action was filed on January 18, 2000 (Document 29). The motion of the Group to be appointed lead plaintiff was filed the same day (Document 32). In response to an order of the Court determining that the contending parties for lead plaintiff status were equally qualified to assume that role and that the decision on lead plaintiff status would be made by a coin toss to be held on March 6, 2000, SWIB filed, on March 2, 2000, a motion for reconsideration of the Court's decision to hold a coin toss (Document 69). On March 3, 2000, the Group filed an opposition to SWIB's motion, which, given its content, the Court deems to be a motion on behalf of the Group for reconsideration of the Court's decision to hold a coin toss to decide lead plaintiff (Document 72).

in a short order, the Court gave the contenders foreknowledge of its intention to have a public toss of the coin, along with the opportunity to negotiate an arrangement among themselves. This, the Court presumed, would be a fairer way of resolving the matter, all things being equal. In accord with its stated intention, the Court scheduled a public coin toss in its courtroom; however, as the appointed day approached, the contenders filed further motions, requesting that the Court reconsider its decision to hold a coin toss, or, at least, put the coin toss on hold for a brief amount of time. Upon receipt of these motions, the Court found more to consider in resolving the issue of lead plaintiff. As such, on the date of the coin toss and in the interest of making no decision in haste, the Court informed the contenders that the toss would be continued, pending resolution of the motions for reconsideration. It is to these motions for reconsideration that the Court now turns.[2]

---

[2] The Court, in its order scheduling a coin toss, had yet to decide the lead plaintiff issue, instead determining only the manner in which the issue would ultimately be decided. As such, the styled motions for reconsideration filed by SWIB and the Group are not motions for reconsideration in the typical sense of a motion to readdress an adverse decision of the Court, as no decision that can be considered adverse has previously been made. Instead, the Court, in this memorandum opinion, treats the matter of lead plaintiff as one raised on initial motions of the parties.

BACKGROUND

**Allegations Derived from the Complaints.**[3]

The claims stated in the complaints stem from the actions of various individuals in the sale and purchase of Just for Feet common stock. Throughout the alleged class period, Just for Feet, although incorporated in Delaware, was principally an Alabama corporation, headquartered in Pelham, Alabama, and running its operations from there.[4] Until trading was halted on November 2, 1999, shares of Feet common stock were publicly traded on the NASDAQ National Market System.

At the opening of the class period, Feet was a paradigmatic operator of large-scale specialty stores — large warehouse stores focusing on the sale of a single type of goods, such as casual clothing, books or housewares — the primary business of which was the sale of athletic and outdoor footwear to end-line customers. It operated fifty-four

---

[3] The Court emphasizes that the facts utilized in narrative contained in this section of the background are simply culled from the complaints filed in the consolidated actions. At points in its discussion of the background, the Court makes reference to the filed Form 10-Q and 10-K reports of Just for Feet. As these materials are a matter of public record, obtainable from the Securities and Exchange Commission through its searchable Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system. *See* FEDERAL RULE OF EVIDENCE 201. The veracity of the factual allegations appearing in the complaints is a matter to be determined through discovery and demonstrated, ultimately, at trial, if the litigation proceeds to that point. To the extent that this narrative of facts is deficient, it is due to an absence of detail in the filed complaints. These complaints lack specifics as to what statements contained misrepresentations; the times at which various misrepresentations were made; who made or knowingly did not stop another from making misrepresentations; and what rendered each misrepresentation false. The complaints also do little to indicate market reaction to the allegedly misleading statements, when and how the falsity of those statements came to light, and the immediate and lasting consequences of those revelations.

[4] Just for Feet is not a party to the instant action. However, various officers and directors of the company, as well as others involved in the making of representations on behalf of Just for Feet are parties to this action, which arises out of their acts with respect to Just for Feet.

company-owned and eight franchised superstores in seventeen states and, after acquiring two smaller companies in March of 1997, it ran thirty company-owned and forty-eight franchised specialty stores in eighteen states and Puerto Rico. Allegedly, at this time, the overall market for the sale of athletic footwear was flagging; however, for the most part, Feet had purportedly managed, prior to the opening of the class period, to outperform the poor market and increase its sales and profits. Nonetheless, the complaints allege, the officers and directors of Feet were keenly aware of the continuing pressures of the market upon Feet's business and allegedly decided, in order to remain buoyed atop the shrinking market for the athletic footwear, to expand Feet's share of that market.[5] The complaints aver that the officers and directors of Just for Feet decided to mask any losses incurred in the expansion through the use of fraudulent accounting practices, in order that the expansion occur with a minimum of dissent from shareholders.

In essence, the complaints allege that in each Form 10-Q or 10-K filed with the SEC, along with public releases touting Feet's performance, the Defendants made or participated in the making of several fraudulent misrepresentations by overstating the total sales of Feet, its gross and net income, and income per share, from April 1, 1997, until, apparently, the filing on September 15, 1999, of a Form 12B-25 statement of late filing which noted the forthcoming issuance of a statement reporting unfavorable second quarter performance.[6] According to the complaints, in order to disguise the falsity of Feet's assertions regarding profitability and cash flow during this time period, the

---

[5] The first of these expansion attempts involved the acquisition of Athletic Attic and Imperial Sports by Just for Feet, announced by then-president, CEO and chairman of the Feet's board of directors, Harold Ruttenberg ("Ruttenberg"), on March 18, 1997.

[6] The lead plaintiff contenders also posit the existence of other statements that were not misleading and had the effect of deflating Feet's stock, although the content and timing of these statements are not disclosed other than that one was made on January 21, 1999.

directors and officers of Feet engaged in a number of improper accounting practices. For example, both complaints allege the following, in nearly identical terms:[7]

> Feet entered into agreements with certain vendors which due to its improper accounting, resulted in overstating quarterly net income throughout the Class Period. Rather than donate the vendor fixtures to new stores, which is the standard industry practice, Feet would have vendors remit monies up front for the value of the store fixtures, and include that in current income. Then, Feet would buy the fixtures (shelving, displays, etc.) from the vendors for the same amount, capitalize the amounts as an asset, and depreciate the asset over time. The sham transactions were not income to Feet as required by [Generally Accepted Accounting Principles ("GAAP")] as Feet had not earned the income.

*Massey* Complaint at ¶ 66. Among other intentional accounting mishaps attributed to Just for Feet are the false accrual of income credits for cooperative advertising from vendors; the understatement of operating expenses and overstating of accounts receivable by $500,000.00 related to uncollectible accounts from CheckCare, its check validation vendor; overstatement of inventory through improper capitalization of operating costs; and improper calculation of the value of inventory by determining its worth based upon the greater, rather than the lesser, of the cost of that inventory or its market value.

The complaints also state two particular incidents of fraud committed by the officers and directors of Just for Feet that are confined to particular moments within the class period. As stated in the *Massey* complaint:

> Just for Feet management . . . concealed the Company's performance by improper use of acquisition accounting entries relating to the Sneaker Stadium acquisition. These unjustified entries causing the inventory reserves of Sneaker Stadium to be set greatly in excess of the necessary

---

[7] The choice of quotation from the *Massey* complaint is merely a decision based upon the clarity of expression in that example. A (very) few word changes in the drafting of the quoted paragraph would yield the same allegation in paragraph 41 of the *Burke* complaint.

amounts, then reducing those reserves in subsequent quarters as needed to allow the Company to report inflated earnings. Per the 10-Q for the quarter ended July 31, 1998 the defendants caused the company to show an estimate of inventory value for the inventory acquired from Sneaker Stadium to be $36.4 million. In the 10-Q for the quarter ended October 31, 1998 the amount was adjusted downward to $27.6 million. Defendants caused Feet to adjust the inventory reserve by increasing its acquisition-related inventory reserve, with an offsetting increase to goodwill (which is being amortized over thirty years). The defendants then offset cost of sales against the excess Stadium Sneaker inventory [re]serves causing Just for Feet's profit margins and net profits to be overstated. This treatment effectively masked poor operational results by reducing cost of sales, postponing recognition of costs that should have been charged to income currently.

*Massey* Complaint at ¶ 61. It is also alleged that six weeks prior to the announcement by Just for Feet that it would file a petition of bankruptcy under Chapter 11, the officers and directors of Feet knew of such an intention, but did not disclose such to the public, in order to arrange a secret repayment plan with certain of Feet's creditors unfavorable to the shareholders.

The complaints attribute this wrongdoing to a host of officers and directors of Just for Feet, averring that each either participated in the wrongdoing or permitted it to happen, with his or her knowledge and blessing, despite the presence of duty to intervene in and correct the wrongdoing. These officers and directors include Ruttenberg,[8] Eric L.

---

[8] Ruttenberg was the president, CEO and chairman of the board of directors of Just for Feet from the start of the alleged class period until March of 1999, when he stepped down from the positions of president and CEO. Ruttenberg remained board chairman throughout the class period. Ruttenberg signed each Form 10-K and Form 10-Q filed by Just for Feet, each annual report, each proxy statement, and each letter to shareholders issued during the class period. During the class period, on May 8, 1998, Ruttenberg allegedly sold 413,850 shares of Feet common stock and realized $5,897,362.50 from the sale, all the while knowledgeable that the price of Just for Feet stock was being buoyed by the disbursement of false financial data.

Tyra ("Tyra"),[9] Peter Berman ("Berman"),[10] Cooper Evans ("Evans"),[11] Patrick Lloyd ("Lloyd"),[12] Michael Lazarus ("Lazarus"),[13] Randall L. Haines ("Haines"),[14] David F. Bellet ("Bellett"),[15] Bart Starr, Sr. ("Starr"),[16] Edward S. Croft, III ("Croft"),[17] Warren C. Smith,

---

[9]  Tyra was, from May of 1997 until the close of the class period, the executive vice president of Feet and its chief financial officer.  Allegedly, Tyra signed each of Just for Feet's Forms 10-K and letters to shareholders issued in connection with the annual reports for the fiscal years ending in January 1998 and 1999.

[10]  Throughout the class period, Berman was a controller and financial officer of Just for Feet.  As such, avers the *Burke* complaint, he "was responsible for all accounting and data processing activities at Just For Feet." *Burke* Complaint at ¶ 17.

[11]  Evans was Just for Feet's director of financial reporting, partially responsible for financial data reported to third parties.

[12]  The complaints charge Lloyd as being the accounting manager for Feet and as being responsible for financial data reported to third parties.

[13]  Lazarus was a director of Feet during the class period.

[14]  Haines was a director of Just for Feet during the class period.

[15]  During the class period, Bellet acted as a director of Just for Feet.

[16]  Starr was a director of Just for Feet during the class period.  It is alleged that on July 24, 1998, knowing of Just for Feet's financial troubles and the misrepresentations being made about those troubles, he also sold 4,833 shares of Just for Feet common stock, realizing proceeds of about $118,408.50.

[17]  Croft was a director of Feet during the class period.

Jr. ("Smith"),[18] Helen Rockey ("Rockey"),[19] John A. Berg ("Berg"),[20] and Don-Allen Ruttenberg ("D. Ruttenberg").[21]

With regard to Deloitte & Touche ("Deloitte"), the *Burke* complaint alleges that it was derelict in its duty to expose the improper accounting practices of Just for Feet. In particular, the *Burke* complaint avers that Deloitte, while issuing audit reports on the company's financial statements for the fiscal year ending January 1998 through the end of the class period, failed to insure that the underlying audit tests conformed to generally accepted auditing standards ("GAAS"). Among other things, the complaint alleges that Deloitte violated GAAS in that its senior personnel did not adequately supervise junior personnel; that it did not develop an audit plan that would screen for management irregularities; that Deloitte's auditors had an inadequate understanding of Feet's operations; that the auditors insufficiently examined collected evidence to make informed opinions about the financial statements audited by it; and that it failed to report problems to the audit committee of Feet's board of directors. These failures, allege the *Burke* complaint, were of such a degree as to be actionable both under section 10(b) of the Exchange Act and rule 10b-5 promulgated pursuant thereto and under state law for the torts of professional negligence and common law fraud and deceit. These claims are also leveled against Steven H. Barry ("Barry"), who was, during the class period, the Birmingham office managing partner of Deloitte and the audit partner on Deloitte's audit

---

[18] During the class period, Smith was a director of Just for Feet.

[19] At all times during the class period, Rockey was a director of Just for Feet. After March of 1999, she became president and CEO of the company, a position she retained until the conclusion of the class period.

[20] Berg was a director of Feet during the class period.

[21] D. Ruttenberg was an officer and employee of Feet and the son of Ruttenberg.

of Just for Feet, and against Karen Baker ("Baker"), who was, during the class period, the senior manager in the audit of Just for Feet.

## Lead Plaintiff Competitors.[22]

There are two competitors for lead plaintiff in the instant case, SWIB and the Group. While the former is a clearly demarcated entity, there is some difficulty in describing precisely what the contours of the Group are. This is the case because, at different points in its motions and briefs and depending on how beneficial a given definition is to its arguments, the Group defines itself either as the sum total of all persons who filled out the two hundred ninety-eight (298) certifications allegedly pursuant to 21D(a)(2)(A) that are attached to the motion to appoint the Group lead plaintiff or as the twelve-person "steering committee" selected from those attached certifications. For purposes of clarification, the relevant features of the broader group, as well as the salient characteristics of each member of the "steering committee," will be set forth herein.

## State of Wisconsin Investment Board.

SWIB acts in a fiduciary capacity as investment manager for the Wisconsin Public Employee Retirement System (the "System"), among other Wisconsin entities, in which nearly 450,000 state and local employees of the State of Wisconsin participate. The System for which SWIB invests is the ninth largest public pension fund in the United States, with over $69 billion in retirement and other public funds under its management. With the funds at its disposal, SWIB began purchasing Just for Feet stock in 1997. Its purchases of Just for Feet common stock occurred in two separate periods, broken by an

---

[22] The facts contained in this section are drawn from the affidavits and certifications filed by the lead plaintiff contenders.

approximate four month period of sale of that stock. The first period, lasting from May 29, 1997, until August 22, 1997, encompassed the following purchases at the listed prices:[23]

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 05/27/97 | 50,000 | $17.625000 | $881,250.000000 |
| 06/12/97 | 25,000 | $18.530000 | $463,250.000000 |
| 06/13/97 | 100,000 | $18.370000 | $1,837,000.000000 |
| 06/13/97 | 25,000 | $18.313000 | $457,825.000000 |
| 06/16/97 | 60,000 | $18.188000 | $1,091,280.000000 |
| 06/16/97 | 5,000 | $18.155000 | $90,775.000000 |
| 06/16/97 | 40,000 | $18.281250 | $731,250.000000 |
| 06/17/97 | 125,000 | $17.875000 | $2,234,375.000000 |
| 06/18/97 | 50,000 | $17.750000 | $887,500.000000 |
| 06/18/97 | 6,200 | $17.643000 | $109,386.600000 |
| 06/19/97 | 100,000 | $17.750000 | $1,775,000.000000 |
| 06/19/97 | 5,800 | $17.767000 | $103,048.600000 |
| 06/23/97 | 90,000 | $17.229000 | $1,550,610.000000 |
| 06/23/97 | 62,100 | $17.422000 | $1,081,906.200000 |
| 06/24/97 | 45,000 | $17.236000 | $775,620.000000 |
| 06/24/97 | 75,000 | $17.600000 | $1,320,000.000000 |
| 06/24/97 | 7,900 | $17.405000 | $137,499.500000 |
| 06/24/97 | 20,000 | $17.395000 | $347,900.000000 |
| 06/25/97 | 65,000 | $16.875000 | $1,096,875.000000 |
| 06/25/97 | 35,000 | $16.807000 | $588,245.000000 |

---

[23] The listed transactions may not fully conform to those prices listed by SWIB, as the Court, unlike SWIB, did not round total purchase prices to the nearest cent, nor did it deduct the cost of commissions.

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 06/27/97 | 250,000 | $16.750000 | $4,187,500.000000 |
| 08/11/97 | 150,000 | $17.875000 | $2,681,250.000000 |
| 08/14/97 | 75,000 | $15.875000 | $1,190,625.000000 |
| 08/14/97 | 80,000 | $16.562500 | $1,325,000.000000 |
| 08/14/97 | 20,000 | $16.030000 | $320,600.000000 |
| 08/18/97 | 25,000 | $15.875000 | $396,875.000000 |
| 08/21/97 | 100,000 | $12.750000 | $1,275,000.000000 |
| 08/22/97 | 80,000 | $12.625000 | $1,010,000.000000 |
| TOTALS | 1,772,000 | | $29,947,445.900000 |

From August 23, 1997, until August 13, 1998, a period of nearly one year, SWIB made no purchases of Just for Feet common stock. However, in a four month period beginning on March 16, 1998, and ending on July 6, 1998, SWIB sold every share of Just for Feet stock that it had acquired during the Summer of 1997. During this time period in 1998 the following sales were made:

| DATE | SHARES SOLD | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 03/16/98 | 10,000 | $20.765600 | $207,656.000000 |
| 03/16/98 | 75,000 | $20.666600 | $1,549,995.000000 |
| 03/16/98 | 50,000 | $20.500000 | $1,025,000.000000 |
| 03/16/98 | 75,000 | $20.583300 | $1,543,747.500000 |
| 03/17/98 | 25,000 | $21.000000 | $525,000.000000 |
| 04/14/98 | 10,000 | $21.125000 | $211,250.000000 |
| 04/14/98 | 37,000 | $21.406500 | $792,040.500000 |
| 04/14/98 | 25,000 | $21.625000 | $540,625.000000 |
| 04/14/98 | 28,000 | $21.625000 | $605,500.000000 |

| DATE | SHARES SOLD | PRICE PER SHARE | TOTAL |
|------|-------------|-----------------|-------|
| 04/15/98 | 5,000 | $22.218800 | $111,094.000000 |
| 04/15/98 | 25,000 | $22.250000 | $556,250.000000 |
| 04/17/98 | 1,000 | $22.437500 | $22,437.500000 |
| 04/17/98 | 10,000 | $22.375000 | $223,750.000000 |
| 04/20/98 | 25,000 | $22.500000 | $562,500.000000 |
| 04/20/98 | 10,000 | $22.812500 | $228,125.000000 |
| 04/20/98 | 8,000 | $22.687500 | $181,500.000000 |
| 04/21/98 | 16,000 | $22.781300 | $364,500.800000 |
| 04/22/98 | 25,000 | $23.000000 | $575,000.000000 |
| 05/04/98 | 699 | $24.017900 | $16,788.512100 |
| 05/04/98 | 5,798 | $24.017900 | $139,255.784200 |
| 05/04/98 | 12,003 | $23.500000 | $282,070.500000 |
| 05/21/98 | 20,000 | $22.375000 | $447,500.000000 |
| 05/22/98 | 10,000 | $22.218800 | $222,188.000000 |
| 05/22/98 | 40,000 | $22.531300 | $901,252.000000 |
| 05/26/98 | 9,988 | $22.250000 | $222,233.000000 |
| 05/26/98 | 40,012 | $22.250000 | $890,267.000000 |
| 05/28/98 | 10,000 | $22.406300 | $224,063.000000 |
| 05/28/98 | 23,500 | $22.500000 | $528,750.000000 |
| 05/28/98 | 40,000 | $22.500000 | $900,000.000000 |
| 05/29/98 | 45,000 | $22.344000 | $1,005,480.000000 |
| 05/29/98 | 5,000 | $22.406300 | $112,031.500000 |
| 06/03/98 | 40,011 | $22.343800 | $893,997.781800 |
| 06/03/98 | 9,989 | $23.343800 | $233,181.218200 |
| 06/08/98 | 9,989 | $23.187500 | $231,619.937500 |

| DATE | SHARES SOLD | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 06/08/98 | 32,963 | $23.594700 | $777,752.096100 |
| 06/08/98 | 1,998 | $23.308100 | $46,569.583800 |
| 06/08/98 | 4,994 | $23.750000 | $118,607.500000 |
| 06/08/98 | 40,011 | $23.187500 | $927,755.062500 |
| 06/08/98 | 132,037 | $23.594700 | $3,115,373.403900 |
| 06/08/98 | 8,002 | $23.308100 | $186,511.416200 |
| 06/08/98 | 20,006 | $23.750000 | $475,142.500000 |
| 06/09/98 | 125,000 | $25.067500 | $3,133,437.500000 |
| 06/09/98 | 25,000 | $25.516300 | $637,907.500000 |
| 06/09/98 | 90,000 | $25.500000 | $2,295,000.000000 |
| 06/10/98 | 1,998 | $25.343800 | $50,636.912400 |
| 06/10/98 | 8,002 | $25.343800 | $202,801.087600 |
| 06/12/98 | 40,000 | $24.625000 | $985,000.000000 |
| 06/12/98 | 10,000 | $24.685600 | $246,856.000000 |
| 06/16/98 | 12,003 | $24.589200 | $295,144.167600 |
| 06/16/98 | 2,997 | $24.589200 | $73,693.832400 |
| 06/16/98 | 12,003 | $24.750000 | $297,074.250000 |
| 06/16/98 | 2,997 | $24.750000 | $74,175.750000 |
| 06/16/98 | 20,006 | $24.875000 | $497,649.250000 |
| 06/16/98 | 4,994 | $24.875000 | $124,225.750000 |
| 06/16/98 | 20,006 | $24.843800 | $497,025.062800 |
| 06/16/98 | 4,994 | $24.843800 | $124,069.937200 |
| 06/16/98 | 56,016 | $24.607100 | $1,378,391.313600 |
| 06/16/98 | 13,984 | $24.607100 | $344,105.686400 |
| 06/17/98 | 65,000 | $25.538500 | $1,660,002.500000 |

| Date | Shares Sold | Price Per Share | Total |
|------|-------------|-----------------|-------|
| 06/17/98 | 25,000 | $25.375000 | $634,375.000000 |
| 06/17/98 | 10,000 | $25.125000 | $251,250.000000 |
| 06/22/98 | 24,007 | $26.770800 | $642,686.595600 |
| 06/22/98 | 13,995 | $26.770800 | $374,657.346000 |
| 06/22/98 | 22,004 | $26.475000 | $582,555.900000 |
| 06/22/98 | 4,994 | $26.475000 | $132,216.150000 |
| 06/23/98 | 15,000 | $27.750000 | $416,250.000000 |
| 06/23/98 | 10,000 | $27.156300 | $271,563.000000 |
| 06/23/98 | 10,000 | $27.250000 | $272,500.000000 |
| 06/23/98 | 30,000 | $27.250000 | $817,500.000000 |
| 06/25/98 | 16,005 | $27.625000 | $442,138.125000 |
| 06/25/98 | 3,995 | $27.625000 | $110,361.875000 |
| 06/29/98 | 4,995 | $28.500000 | $142,357.500000 |
| 06/29/98 | 20,005 | $28.500000 | $570,142.500000 |
| 07/06/98 | 20,006 | $28.937500 | $578,923.625000 |
| 07/06/98 | 4,994 | $28.937500 | $144,513.875000 |
| Totals | 1,772,000 | | $42,025,549.087900[24] |

---

[24] In calculating the total number of shares that it sold, the Court has discovered two discrepancies. The first is between the figures on the blocks of shares sold by SWIB on June 16, 1998, contained in the affidavit of John F. Nelson ("Nelson") accompanying the original motion to appoint SWIB lead plaintiff filed on January 18, 2000, and those contained in the affidavit of Nelson filed on March 17, 2000. In both sets of figures, the total number of shares sold on June 16, 1998, is 150,000, but the individual blocks of shares said to have been sold vary. Since the information contained in the later filing is accompanied by the amount paid per share, it is presumably the more accurate accounting.

The second discrepancy involves the number of shares purchased on June 22, 1998. In the list of transactions accompanying Nelson's January 18, 2000, affidavit, the number of Just for Feet common stock shares listed as sold in a particular block is 22,004. However, in the March 17, 2000, affidavit, that number is asserted to be 22,006. The Court finds the number of shares alleged

By the end of the day on July 6, 1998, SWIB held no remaining shares in Just for Feet. In selling its shares, SWIB not only recovered its investment in the Just for Feet common stock bought in the Summer of 1997, it profited considerably from the sale of said stock. First, on *not a single share* purchased between May 29, 1997, and August 22, 1997, did SWIB lose money. The highest price that SWIB paid for a share of stock during that summer was $18.53, an amount that included commissions. The lowest price at which SWIB sold that stock was $20.50. The total profit made by SWIB on these transactions was $ 12,106,071.1879.

On August 13, 1998, over a month after dispossessing itself of its earlier shares of Just for Feet stock, SWIB made two purchases of Just for Feet stock:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 08/13/98 | 80,023 | $14.750000 | $1,180,339.250000 |
| 08/13/98 | 19,977 | $14.750000 | $294,660.750000 |
| TOTALS | 100,000 | | $1,475,000.000000 |

SWIB purchased no more shares of Just for Feet stock until January 22, 1999, when SWIB made four more large block purchases:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 01/22/99 | 45,947 | $13.168500 | $605,053.069500 |
| 01/22/99 | 193,043 | $13.168500 | $2,542,086.745500 |
| 01/22/99 | 153,874 | $13.800800 | $2,123,584.299200 |
| 01/22/99 | 472,136 | $13.800800 | $6,515,854.508800 |
| TOTALS | 865,000 | | $11,786,578.623000 |

---

to have been sold in the January 18, 2000, affidavit to be correct, as were the court to find the number recorded in the later affidavit correct, SWIB would have, by July 6, 1998, sold 1,772,002 shares of Just for Feet common stock, two more shares than it ever purchased.

SWIB then owned a total of 965,000 shares of Just for Feet common stock. On May 11, 1999, SWIB went on another spate of summer buying of Just for Feet stock. During that period, SWIB made the following purchases:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 05/11/99 | 50,000 | $10.406300 | $520,315.000000 |
| 05/12/99 | 19,977 | $10.437500 | $208,509.937500 |
| 05/12/99 | 80,023 | $10.437500 | $835,240.062500 |
| 05/14/99 | 125,000 | $11.255000 | $1,406,875.000000 |
| 05/17/99 | 4,994 | $11.187500 | $55,870.375000 |
| 05/17/99 | 20,006 | $11.187500 | $223,817.125000 |
| 05/25/99 | 80,023 | $8.718800 | $697,704.532400 |
| 05/25/99 | 40,011 | $8.718800 | $348,847.906800 |
| 05/25/99 | 19,977 | $8.718800 | $174,175.467600 |
| 05/25/99 | 9,989 | $8.718800 | $87,092.093200 |
| 05/27/99 | 21,500 | $7.446600 | $160,101.900000 |
| 05/27/99 | 25,000 | $7.500000 | $187,500.000000 |
| 05/27/99 | 59,500 | $7.500000 | $446,250.000000 |
| 06/04/99 | 100,000 | $6.937500 | $693,750.000000 |
| 06/07/99 | 4,994 | $6.410600 | $32,014.536400 |
| 06/07/99 | 20,006 | $6.390000 | $127,838.340000 |
| 06/07/99 | 3,995 | $6.437500 | $25,717.812500 |
| 06/07/99 | 5,602 | $6.436300 | $36,056.152600 |
| 06/07/99 | 16,005 | $6.437500 | $103,032.187500 |
| 06/07/99 | 1,398 | $6.406300 | $8,956.007400 |
| 06/08/99 | 500 | $6.467500 | $3,233.750000 |
| 06/09/99 | 2,997 | $6.562500 | $19,667.812500 |

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 06/09/99 | 3,836 | $6.519900 | $25,010.336400 |
| 06/09/99 | 12,003 | $6.562500 | $78,769.687500 |
| 06/09/99 | 15,364 | $6.519900 | $100,171.743600 |
| 06/10/99 | 10,643 | $6.437500 | $68,514.312500 |
| 06/10/99 | 2,657 | $6.437500 | $17,104.437500 |
| 06/15/99 | 15,000 | $5.250000 | $78,750.000000 |
| 06/15/99 | 50,000 | $4.995100 | $249,755.000000 |
| 06/16/99 | 68,020 | $5.294100 | $360,104.682000 |
| 06/16/99 | 16,980 | $5.294100 | $89,893.818000 |
| 07/09/99 | 61,929 | $5.625000 | $348,350.625000 |
| 07/09/99 | 248,071 | $5.625000 | $1,395,399.375000 |
| 07/23/99 | 14,983 | $5.187500 | $77,724.312500 |
| 07/23/99 | 60,017 | $5.187500 | $311,338.187500 |
| 07/27/99 | 28,008 | $4.919600 | $137,788.156800 |
| 07/27/99 | 6,992 | $4.919600 | $34,397.843200 |
| 07/30/99 | 100,000 | $3.687500 | $368,750.000000 |
| TOTALS | 1,426,000 | | $10,144,388.516400[25] |

---

[25] As with its list of sales, the amounts listed in the chart enumerating purchases of stock by SWIB during the summer of 1999 in the January 18, 2000, affidavit of Nelson and in the March 17, 2000, affidavit of Nelson contains a discrepancy. In the former affidavit, Nelson lists a single block purchase of 22,004 on June 7, 1999. However, in the later affidavit, he breaks this single block purchase into two block purchases, one of 20,006 shares of Just for Feet common stock purchased at a price of $ 6.39 per share and another of 1,398 shares at $ 6.4063 per share. The amounts of the two purchases vary; however, the difference for purposes of this motion is ultimately one without distinction, in that the total number of shares purchased remains the same, although the total loss may differ. This Court cannot calculate this possible loss, though, as the chart attached to the earlier affidavit of Nelson does not contain purchase prices.

After July 30, 1999, SWIB ceased buying shares of Just for Feet stock and by the end of the class period, November 2, 1999, the total shares of Just for Feet stock owned by SWIB totaled 2,391,000.[26]   The total amount paid for these shares was $23,405,967.1394, an amount SWIB declares to be its total loss.

## Just for Feet Plaintiffs Group & Steering Committee.

In the opening paragraph of its motion to be appointed lead plaintiff in the present litigation, the Group introduces itself in the following terms:

> Movants, who collectively suffered damages of $6,530,197.59 as a result of their purchase of Just for Feet, Inc., publicly traded securities, including common stock, submit this motion, pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934 for: (1) appointment of lead plaintiffs; and (2) approval of lead plaintiffs' selection of co-lead counsel.  Movants proffer for appointment as lead plaintiffs the Just for Feet Plaintiffs Group, *which consists of a group of 12 class members who together lost $2,554,802.12* as a result of their purchase or acquisition of Feet securities.  Because the Just for Feet Plaintiffs Group includes institutions and individuals who purchased or otherwise acquired Feet securities, including Feet common stock, the Just For Feet Plaintiffs Group is also the most diverse lead plaintiff group and best able to represent the interest of all class members.  In order to facilitate the efficient management and oversight of this litigation, *the Just For Feet Plaintiffs Group has formed a Steering Committee*

---

[26] In its brief in support of its motion to be appointed lead plaintiff, SWIB makes the following declaration: "As of November 1, 1999, SWIB held 2,391,000 shares of Just for Feet, Inc., . . . all of which were purchased between April 1, 1997 and November 1, 1999, the Class Period." In the broadest sense, this statement is true, as SWIB's shares were purchased in a period of time that exists between April 1, 1997 and November 1, 1999.  However, the connotation of this statement is that at least some of the shares of Just for Feet owned by SWIB at the close of the class period were purchased at the beginning of that period, a fact that, as has been shown in the text, is demonstrably untrue.

> *of 12 members to provide a vehicle to efficiently and effectively oversee and*
> *manage the litigation going forward.*

Memorandum of Law in Support of Motion to Appoint the Just for Feet Plaintiffs Group as Lead Plaintiffs Pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934 and to Approve Lead Plaintiff's Choice of Counsel ("Group Memorandum I") at 1 (emphasis added and internal citations omitted). Thus begins the Groups's varying attempts at self-definition. In places, as at the beginning of the introductory paragraph, the Group defines itself as twelve members of the class whose total losses amount to $2,554,802.12. However, at other points, for example, in the last sentence of the introductory paragraph, the Group appears to define itself as the whole set of individuals who lost nearly $6.5 million, referring to the twelve class members as merely the "steering committee." Before attempting to muddle this problem out, the Court will describe the relevant features of the members of the purported steering committee.

*George Burman.*

Beginning on March 5, 1998, George Burman ("Burman") made the following purchases of Just for Feet common stock:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 03/05/98 | 2,000 | $17.880000 | $35,760.000000 |
| 08/28/98 | 3,000 | $14.000000 | $42,000.000000 |
| 03/05/99 | 5,000 | $12.060000 | $60,300.000000 |
| 05/11/99 | 5,000 | $10.440000 | $52,200.000000 |
| 06/01/99 | 5,000 | $7.750000 | $38,750.000000 |
| 07/28/99 | 10,000 | $4.250000 | $42,500.000000 |
| TOTALS | 30,000 | | $271,510.000000 |

Burman sold none of the shares purchased by him.  He alleges a loss of the total amount paid by him for the Just for Feet stock, $ 271,510.00.

*Kenneth P. Bush and Louise M. Bush.*

Kenneth P. Bush ("Mr. Bush") and Louise Bush ("Ms. Bush" and, collectively, the "Bushes") apparently share joint ownership of 23,200 shares of Just for Feet common stock purchased during the class period.  These shares were purchased between May 19, 1997, and August 19, 1999, inclusive:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 05/19/97 | 100 | $18.750000 | $1,875.000000 |
| 05/19/97 | 100 | $18.500000 | $1,850.000000 |
| 05/19/97 | 100 | $18.625000 | $1,862.500000 |
| 05/19/97 | 100 | $18.275000 | $1,827.500000 |
| 08/20/97 | 200 | $12.312500 | $2,462.500000 |
| 08/20/97 | 800 | $12.625000 | $10,100.000000 |
| 08/20/97 | 200 | $12.375000 | $2,475.000000 |
| 08/20/97 | 300 | $12.687500 | $3,806.250000 |
| 08/20/97 | 700 | $15.562500 | $10,893.750000 |
| 08/20/97 | 1,225 | $12.500000 | $15,312.500000 |
| 05/14/98 | 500 | $19.500000 | $9,750.000000 |
| 05/15/98 | 300 | $19.250000 | $5,775.000000 |
| 05/15/98 | 500 | $19.375000 | $9,687.500000 |
| 05/15/98 | 200 | $19.375000 | $3,875.000000 |
| 07/21/98 | 100 | $23.625000 | $2,362.500000 |
| 07/21/98 | 100 | $23.625000 | $2,362.500000 |
| 07/21/98 | 500 | $23.750000 | $11,875.000000 |

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 12/22/98 | 100 | $14.625000 | $1,462.500000 |
| 12/22/98 | 600 | $14.250000 | $8,550.000000 |
| 12/22/98 | 100 | $15.375000 | $1,537.500000 |
| 12/22/98 | 100 | $15.250000 | $1,525.000000 |
| 12/22/98 | 100 | $15.437500 | $1,543.750000 |
| 01/15/99 | 450 | $17.375000 | $7,818.750000 |
| 01/15/99 | 100 | $17.437500 | $1,743.750000 |
| 01/15/99 | 150 | $17.312500 | $2,596.875000 |
| 01/15/99 | 300 | $17.187500 | $5,156.250000 |
| 01/15/99 | 100 | $17.250000 | $1,725.000000 |
| 01/22/99 | 50 | $14.375000 | $718.750000 |
| 01/22/99 | 150 | $14.000000 | $2,100.000000 |
| 01/22/99 | 100 | $13.875000 | $1,387.500000 |
| 01/22/99 | 150 | $14.500000 | $2,175.000000 |
| 01/22/99 | 100 | $14.875000 | $1,487.500000 |
| 01/22/99 | 100 | $13.625000 | $1,362.500000 |
| 01/22/99 | 50 | $14.937500 | $746.875000 |
| 02/22/99 | 500 | $11.625000 | $5,812.500000 |
| 02/22/99 | 100 | $11.375000 | $1,137.500000 |
| 02/25/99 | 100 | $11.250000 | $1,125.000000 |
| 02/25/99 | 125 | $10.937500 | $1,367.187500 |
| 02/25/99 | 100 | $11.312500 | $1,131.250000 |
| 02/25/99 | 100 | $11.375000 | $1,137.500000 |
| 02/25/99 | 200 | $11.500000 | $2,300.000000 |
| 02/25/99 | 100 | $11.000000 | $1,100.000000 |

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 02/25/99 | 50 | $10.875000 | $543.750000 |
| 02/26/99 | 150 | $10.250000 | $1,537.500000 |
| 02/26/99 | 50 | $10.125000 | $506.250000 |
| 02/26/99 | 200 | $10.187500 | $2,037.500000 |
| 02/26/99 | 200 | $10.500000 | $2,100.000000 |
| 03/02/99 | 300 | $10.875000 | $3,262.500000 |
| 03/02/99 | 100 | $10.817500 | $1,081.750000 |
| 03/05/99 | 500 | $11.875000 | $5,937.500000 |
| 03/05/99 | 200 | $11.812500 | $2,362.500000 |
| 03/16/99 | 100 | $11.812500 | $1,181.250000 |
| 03/16/99 | 150 | $11.000000 | $1,650.000000 |
| 03/16/99 | 150 | $11.937500 | $1,790.625000 |
| 03/17/99 | 100 | $20.625000 | $2,062.500000 |
| 03/17/99 | 100 | $20.562500 | $2,056.250000 |
| 03/17/99 | 2,000 | $20.750000 | $41,500.000000 |
| 03/17/99 | 200 | $20.875000 | $4,175.000000 |
| 03/18/99 | 350 | $11.750000 | $4,112.500000 |
| 03/18/99 | 200 | $11.687500 | $2,337.500000 |
| 03/23/99 | 50 | $10.562500 | $528.125000 |
| 03/23/99 | 100 | $10.750000 | $1,075.000000 |
| 03/23/99 | 150 | $10.625000 | $1,593.750000 |
| 03/23/99 | 100 | $10.500000 | $1,050.000000 |
| 04/19/99 | 500 | $12.000000 | $6,000.000000 |
| 04/19/99 | 200 | $11.875000 | $2,375.000000 |
| 04/21/99 | 400 | $11.875000 | $4,750.000000 |

| Date | Shares Purchased | Price Per Share | Total |
|------|------------------|-----------------|-------|
| 04/21/99 | 500 | $11.750000 | $5,875.000000 |
| 04/21/99 | 500 | $11.937500 | $5,968.750000 |
| 05/21/99 | 500 | $10.250000 | $5,125.000000 |
| 05/21/99 | 100 | $10.313000 | $1,031.300000 |
| 05/25/99 | 100 | $8.906300 | $890.630000 |
| 05/25/99 | 100 | $8.687500 | $868.750000 |
| 05/25/99 | 50 | $8.875000 | $443.750000 |
| 05/25/99 | 100 | $8.937500 | $893.750000 |
| 05/25/99 | 300 | $8.750000 | $2,625.000000 |
| 05/25/99 | 300 | $8.812500 | $2,643.750000 |
| 05/25/99 | 300 | $8.625000 | $2,587.500000 |
| 05/25/99 | 50 | $8.718800 | $435.940000 |
| 05/28/99 | 100 | $7.500000 | $750.000000 |
| 05/28/99 | 350 | $7.562500 | $2,646.875000 |
| 06/17/99 | 500 | $6.375000 | $3,187.500000 |
| 06/17/99 | 500 | $6.437500 | $3,218.750000 |
| 08/03/99 | 50 | $4.218800 | $210.940000 |
| 08/03/99 | 100 | $4.281800 | $428.180000 |
| 08/03/99 | 150 | $4.187500 | $628.125000 |
| 08/03/99 | 100 | $4.250000 | $425.000000 |
| 08/03/99 | 250 | $4.125000 | $1,031.250000 |
| 08/12/99 | 200 | $4.531300 | $906.260000 |
| 08/12/99 | 300 | $4.500000 | $1,350.000000 |
| 08/12/99 | 500 | $6.187500 | $3,093.750000 |
| 08/12/99 | 200 | $5.968800 | $1,193.760000 |

| Date | Shares Purchased | Price Per Share | Total |
|------|------------------|-----------------|-------|
| 08/12/99 | 50 | $4.562500 | $228.125000 |
| 08/19/99 | 200 | $5.937500 | $1,187.500000 |
| TOTALS | 23,200 | | $304,382.822500[27] |

From the certification filed, it does not appear that the Bushes ever sold any of the shares of Just for Feet common stock purchased by them. In addition to standard purchases of Just for Feet common stock, the Bushes also bought and sold Just for Feet stock options

---

[27] The Court notes that the Group, in reproducing the values of shares purchased by the Bushes, rounded all per-share sale amounts in the hundredths of a cent to tenths of a cent. Thus, amounts of $12.5625 were rendered $12.563 on the Group's recalculation. The Court has undone this and stated per-share purchase prices to the hundredths of a cent, where it has been possible to do so.

The purchases purportedly made on March 17, 1999, seem incongruous with other purchases made during that time and, in fact, in the Bushes' certification, those purchases are listed among the 1998 transactions, although bearing a 1999 designation. While the Court has listed the transactions as having taken place in 1999, they may have occurred in the previous year. Whether true or not, presumed counsel of the Bushes, in the exercise of diligent attention, should have attempted to clarify this matter for the Court. Presumed counsel did not do this in listing a December 22, 1998, transaction of the Bushes of one hundred shares of common stock which they recorded with their certification to have purchased at the price of $ 0.016, but which the Group represents as being purchased at $ 14.625. Given the severe incongruity of the price recorded by the Bushes with any other selling price of Feet stock, the correction is probably warranted, although the specific number given does not seem based upon anything provided by the Bushes.

In addition, the Court notes that there are two purchases not reproduced in the Group's chart that are listed by the Bushes in the shares purchased by them. Both purchases are allegedly made on "04/09/00," although this seems incorrect without further clarification. The amount of the first purchase at 100 shares is at a price of $ 5.875 per share. The second purchase, totaling 500 shares, is in an amount of $ 6.125 per share. The Court will not include these shares in its calculation of amount of loss.

Finally, the Court has listed as the total purchase amount its calculated sum rather than the amount of $302,282.77 listed by the Group as the Bushes' total loss. The difference in the two figures may be attributable equally to the Group's rounding practices, to variances in purchase amounts listed by the Bushes, or to unlisted gains by the Bushes. The Court will however, treat its calculations as stating the proper amount.

during the class period. Their alleged losses in the purchase and sale of the options during the class period total $31,137.50.

Mr. Bush alleges that he has attended all shareholder meetings of Feet since the company's inception. In addition, Mr. Bush asserts that he was present at the Court's hearing on March 6, 2000, and has taken, to the extent presently possible, an active role in the litigation pending.

*Edward E. Eubank.*

Beginning on February 26, 1999, Edward E. Eubank ("Eubank") made the following purchases of common stock:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 02/26/99 | 1,300 | $10.875000 | $14,137.500000 |
| 02/26/99 | 6,600 | $10.937500 | $72,187.500000 |
| 05/27/99 | 1,000 | $7.437500 | $7,437.500000 |
| TOTALS | 8,900 | | $93,762.500000 |

It appears that Eubank continues to hold his 8,900 shares of Just for Feet stock and has, consequently, lost $ 93,637.50. Eubank filed a financial statement with the Court indicating that his losses in Just for Feet common stock far exceed his net worth and filed an affidavit with the Court stating the same. As with the Bushes, Eubank asserts that he was present for the Court's March 6, 2000, hearing and has taken an active interest in the present litigation.

*Larry Fallek.*

Larry Fallek ("Fallek") made the following purchases of Just for Feet stock during the class period:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 08/25/97 | 2,000 | $12.500000 | $25,000.000000 |
| 12/29/97 | 1,000 | $13.187500 | $13,187.500000 |
| 08/14/98 | 2,000 | $16.000000 | $32,000.000000 |
| 09/25/98 | 2,000 | $13.750000 | $27,500.000000 |
| 10/12/98 | 2,000 | $11.750000 | $23,500.000000 |
| 02/18/99 | 1,000 | $13.000000 | $13,000.000000 |
| 03/01/99 | 2,000 | $10.500000 | $21,000.000000 |
| 06/07/99 | 1,000 | $7.312500 | $7,312.500000 |
| 07/27/99 | 1,000 | $5.000000 | $5,000.000000 |
| TOTAL | 14,000 | | $167,500.000000 |

Having purchased 14,000 shares of Just for Feet common stock, none of which he has sold, Fallek has an alleged total loss of $ 167,500.00.


*Glen Guthrie.*

Glen Guthrie ("Guthrie") made two purchases of Just for Feet stock on January 20, 1999, one for 10,000 shares and another for 2,000 shares, paying, in each transaction $ 18.125 per share. Guthrie has not sold his shares in Just for Feet. He claims a total loss of $ 217,500.00.


*Michael Jamison.*

Michael Jamison made the following purchases of Feet common stock:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 08/20/97 | 1,000 | $12.500000 | $12,500.000000 |

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 08/28/97 | 1,000 | $13.635000 | $13,635.000000 |
| 11/07/97 | 600 | $15.875000 | $9,525.000000 |
| 06/15/99 | 2,400 | $5.750000 | $13,800.000000 |
| 09/13/99 | 3,000 | $3.750000 | $11,250.000000 |
| 09/17/99 | 3,000 | $3.063000 | $9,189.000000 |
| 09/17/99 | 3,000 | $3.131000 | $9,393.000000 |
| 09/22/99 | 5,000 | $1.874000 | $9,370.000000 |
| 09/22/99 | 15,000 | $1.889000 | $28,335.000000 |
| 09/27/99 | 10,000 | $2.463000 | $24,630.000000 |
| 09/28/99 | 10,000 | $2.834000 | $28,340.000000 |
| TOTALS | 54,000 | | $169,967.000000[28] |

Jamison sold no shares of Just for Feet and claims a total loss of $ 169,967.00.

*James Mailon Kent III.*

James Mailon Kent III ("Kent") made the following purchases of Just for Feet stock during the class period:

---

[28]  The Court's calculation here differs in some ways from both that in Jamison's certification and the Group's recalculation of the amounts stated in the attachment to Jamison's certification.  Jamison's certification only listed the total price, including commission paid for each entire block shares purchased.  The Court has followed the Group's method of deducting those commissions and dividing the total amounts to obtain a per-share price.  However, the Court differs with the Group on the final calculation of the total value of the shares purchased, which the Group calculates to be $ 169,956.90.  The Court will use its calculation of the total value of the stocks at time of purchase.  The figure computed by the Group may nonetheless be more accurate, utilizing figures that have not been rounded to the nearest tenth of a cent per share.  The difference, however, is of such a small amount that it does not alter the Court's determination of lead plaintiff.

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 01/19/99 | 10,000 | $17.750000 | $177,500.000000 |
| 03/02/99 | 10,000 | $11.062500 | $110,625.000000 |
| TOTALS | 20,000 | | $288,125.000000 |

From the materials provided to the Court, there is no indication that Kent ever rid himself of the 20,000 shares purchased by him. His contended loss therefore totals $288,125.00.

*David Laurents.*

From late May of 1999 until mid-September of the same year, David Laurents ("Laurents") purchased 29,000 shares of Just for Feet common stock. These purchases are as follows:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 05/20/99 | 1,000 | $10.500000 | $10,500.000000 |
| 05/20/99 | 1,000 | $11.000000 | $11,000.000000 |
| 05/20/99 | 1,000 | $10.625000 | $10,625.000000 |
| 05/21/99 | 1,000 | $10.250000 | $10,250.000000 |
| 05/24/99 | 1,000 | $10.562500 | $10,562.500000 |
| 05/25/99 | 1,000 | $8.875000 | $8,875.000000 |
| 05/25/99 | 1,000 | $9.125000 | $9,125.000000 |
| 05/25/99 | 500 | $9.437500 | $4,718.750000 |
| 05/26/99 | 1,000 | $8.312500 | $8,312.500000 |
| 05/26/99 | 2,000 | $7.625000 | $15,250.000000 |
| 05/28/99 | 500 | $7.500000 | $3,750.000000 |
| 06/04/99 | 1,000 | $6.750000 | $6,750.000000 |

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 06/04/99 | 1,000 | $7.000000 | $7,000.000000 |
| 06/07/99 | 1,000 | $6.187500 | $6,187.500000 |
| 06/15/99 | 500 | $5.937500 | $2,968.750000 |
| 06/15/99 | 1,000 | $6.000000 | $6,000.000000 |
| 06/16/99 | 1,000 | $5.468750 | $5,468.750000 |
| 06/24/99 | 500 | $5.937500 | $2,968.750000 |
| 07/02/99 | 1,000 | $6.031250 | $6,031.250000 |
| 07/07/99 | 1,000 | $5.875000 | $5,875.000000 |
| 07/08/99 | 1,000 | $5.750000 | $5,750.000000 |
| 07/08/99 | 1,000 | $5.500000 | $5,500.000000 |
| 07/20/99 | 2,000 | $5.343750 | $10,687.500000 |
| 07/28/99 | 2,000 | $4.187500 | $8,375.000000 |
| 08/20/99 | 1,000 | $5.500000 | $5,500.000000 |
| 08/24/99 | 1,000 | $4.875000 | $4,875.000000 |
| 08/30/99 | 1,000 | $3.937500 | $3,937.500000 |
| 09/16/99 | 1,000 | $3.750000 | $3,750.000000 |
| TOTALS | 29,000 | | $200,593.750000[29] |

[29]  The Group's calculations regarding Laurents' purchases of stock contains numerous errors.  First of these is an over-calculation of the number of shares purchased by Laurents.  In its chart detailing the purchases by Laurents, the Group double counts the August 30, 1999, entry, thereby increasing the total number of shares it records him as having purchased to 30,000. Further, the Group calculates a May 26, 1999, purchase of 1,000 shares to have been at the price of $ 8.625 per share (or 8 9/16 per share), when, Laurents having recorded the price at 8 5/16 per share, the appropriate dollar amount should have $ 8.3125 per share.  The Court therefore will use its calculation to determine the total amount paid for the various shares and, ultimately, to determine Laurents' total loss, for purposes of this motion.

On September 27, 1999, Laurents decided to sell four thousand (4,000) shares of his Just for Feet stock for the price of $ 1.875 per share, for a total of $ 7,500.00. Based on the amounts attached to his lead plaintiff certification, Laurents claims a total loss of $ 193,093.75.[30]

*John Michael.*

John Michael ("Michael"), like SWIB, can be represented as having purchased Just for Feet common stock in blocks, divisible by periods during which he shed himself of any interest in the company. On March 1, 1999, Michael began his first buying period, during which he purchased 21,850 shares of Just for Feet common stock, all but 2,700 shares of which he sold at a profit during approximately the same period and none of which he sold at a loss.

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 03/01/99 | 3,500 | $10.375000 | $36,312.500000 |
| 03/01/99 | 1,300 | $10.375000 | $13,487.500000 |
| 03/01/99 | 500 | $10.312500 | $5,156.250000 |
| 03/01/99 | 200 | $10.312500 | $2,062.500000 |
| 03/02/99 | 200 | $11.125000 | $2,225.000000 |
| 03/02/99 | 1,300 | $11.125000 | $14,462.500000 |
| 03/24/99 | 1,500 | $10.437500 | $15,656.250000 |
| 03/24/99 | 2,000 | $10.437500 | $20,875.000000 |
| 03/24/99 | 1,000 | $10.437500 | $10,437.500000 |
| 03/24/99 | 1,000 | $10.437500 | $10,437.500000 |
| 03/24/99 | 1,500 | $10.437500 | $15,656.250000 |

---

[30]  For the reasons stated in the previous footnote, this amount differs from the $ 197,625.25 loss claimed by the Group in its calculation.

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 03/24/99 | 500 | $10.437500 | $5,218.750000 |
| 04/13/99 | 1,500 | $11.625000 | $17,437.500000 |
| 04/13/99 | 1,400 | $11.625000 | $16,275.000000 |
| 04/13/99 | 450 | $11.625000 | $5,231.250000 |
| 04/13/99p | 4,000 | $11.625000 | $46,500.000000 |
| TOTALS | 21,850 | | $237,431.250000 |

From March 22, 1999, until April 23, 1999, he sold each of these shares, apparently in the same blocks in which he purchased them. These sales are detailed below:

| DATE | SHARES SOLD | PRICE PER SHARE | TOTAL |
|------|-------------|-----------------|-------|
| 03/22/99 | 3,500 | $11.312500 | $39,593.750000 |
| 03/22/99 | 1,300 | $11.312500 | $14,706.250000 |
| 03/22/99 | 500 | $11.250000 | $5,625.000000 |
| 03/22/99 | 200 | $11.500000 | $2,300.000000 |
| 03/22/99 | 200 | $11.500000 | $2,300.000000 |
| 03/22/99 | 1,300 | $11.125000 | $14,462.500000 |
| 03/29/99 | 1,500 | $13.500000 | $20,250.000000 |
| 04/08/99 | 2,000 | $11.625000 | $23,250.000000 |
| 04/08/99 | 1,000 | $11.562500 | $11,562.500000 |
| 04/12/99 | 1,000 | $11.187500 | $11,187.500000 |
| 04/12/99 | 1,500 | $11.125000 | $16,687.500000 |
| 04/14/99 | 500 | $11.687500 | $5,843.750000 |
| 04/14/99 | 1,500 | $11.687500 | $17,531.250000 |
| 04/14/99 | 1,400 | $11.625000 | $16,275.000000 |
| 04/23/99 | 450 | $11.687500 | $5,259.375000 |

| Date | Shares Sold | Price Per Share | Total |
|------|------------|-----------------|-------|
| 04/23/99 | 4,000 | $13.500000 | $54,000.000000 |
| Totals | 21,850 | | $260,834.375000 |

On the sale of these shares, Michael realized an overall gain of $ 23,403.125.

Beginning on April 13, 1999, Michael made the following further investments in Feet stock, none of which turned out to be profitable.[31]

| Date | Shares Purchased | Price Per Share | Total |
|------|-----------------|-----------------|-------|
| 04/13/99 | 50 | $11.625000 | $581.250000 |
| 04/21/99 | 1,300 | $11.875000 | $15,437.500000 |
| 05/06/99 | 650 | $10.437500 | $6,784.375000 |
| 05/13/99 | 4,250 | $11.125000 | $47,281.250000 |
| 05/13/99 | 450 | $11.125000 | $5,006.250000 |
| 05/20/99 | 200 | $10.500000 | $2,100.000000 |
| 06/02/99 | 550 | $7.687500 | $4,228.125000 |
| 06/24/99 | 800 | $8.843700 | $7,074.960000 |
| 06/24/99 | 4,200 | $8.843700 | $37,143.540000 |
| 06/30/99 | 500 | $6.375000 | $3,187.500000 |
| 06/30/99 | 4,500 | $6.437500 | $28,968.750000 |
| 07/08/99 | 1,800 | $5.875000 | $10,575.000000 |
| 07/08/99 | 2,200 | $5.937500 | $13,062.500000 |
| 07/22/99 | 15,000 | $5.250000 | $78,750.000000 |
| 07/29/99 | 12,000 | $3.437500 | $41,250.000000 |
| 07/29/99 | 3,000 | $3.406200 | $10,218.600000 |

---

[31] The beginning dates of these purchases overlap with the last date of the profitable purchases by Michael and the dates of the profitable sales of Feet stock.

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 08/16/99 | 500 | $5.375000 | $2,687.500000 |
| 08/16/99 | 1,900 | $5.343700 | $10,153.030000 |
| 08/16/99 | 4,900 | $5.125000 | $25,112.500000 |
| 08/17/99 | 3,500 | $5.375000 | $18,812.500000 |
| 08/17/99 | 1,000 | $5.343700 | $5,343.700000 |
| 08/23/99 | 1,100 | $5.375000 | $5,912.500000 |
| 08/23/99 | 1,400 | $5.375000 | $7,525.000000 |
| 08/23/99 | 2,000 | $5.375000 | $10,750.000000 |
| 08/23/99 | 6,000 | $5.500000 | $33,000.000000 |
| TOTALS | 73,750 | | $430,946.330000 |

From September 10, 1999, through September 22, 1999, Michael sold all of these shares, at an alleged substantial loss.

| DATE | SHARES SOLD | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 09/10/99 | 50 | $4.000000 | $200.000000 |
| 09/10/99 | 1,300 | $4.000000 | $5,200.000000 |
| 09/10/99 | 650 | $4.000000 | $2,600.000000 |
| 09/10/99 | 4,250 | $4.000000 | $17,000.000000 |
| 09/22/99 | 450 | $1.937500 | $871.875000 |
| 09/22/99 | 200 | $1.937500 | $387.500000 |
| 09/22/99 | 550 | $1.937500 | $1,065.625000 |
| 09/22/99 | 800 | $1.937500 | $1,550.000000 |
| 09/22/99 | 4,200 | $1.875000 | $7,875.000000 |
| 09/22/99 | 500 | $1.875000 | $937.500000 |
| 09/22/99 | 4,500 | $1.875000 | $8,437.500000 |

| DATE | SHARES SOLD | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 09/22/99 | 1,800 | $1.875000 | $3,375.000000 |
| 09/22/99 | 2,200 | $1.875000 | $4,125.000000 |
| 09/22/99 | 15,000 | $1.875000 | $28,125.000000 |
| 09/22/99 | 12,000 | $1.875000 | $22,500.000000 |
| 09/22/99 | 3,000 | $1.875000 | $5,625.000000 |
| 09/22/99 | 500 | $1.875000 | $937.500000 |
| 09/22/99 | 1,900 | $1.875000 | $3,562.500000 |
| 09/22/99 | 4,900 | $1.875000 | $9,187.500000 |
| 09/22/99 | 3,500 | $1.875000 | $6,562.500000 |
| 09/22/99 | 1,000 | $1.875000 | $1,875.000000 |
| 09/22/99 | 1,100 | $1.875000 | $2,062.500000 |
| 09/22/99 | 1,400 | $1.875000 | $2,625.000000 |
| 09/22/99 | 2,000 | $1.875000 | $3,750.000000 |
| 09/22/99 | 6,000 | $1.875000 | $11,250.000000 |
| TOTALS | 73,750 | | $151,687.500000 |

In all from the purchase and sale of these shares of Feet stock, Michael lost $ 279,258.83.

This loss apparently did not cool Michael's enthusiasm for Just for Feet stock, however, as one month later, Michael made two purchases of Feet stock totaling 20,200 shares, all of which he continues to hold.

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 10/28/99 | 2,700 | $1.531200 | $4,134.240000 |
| 10/28/99 | 18,500 | $1.500000 | $27,750.000000 |
| TOTALS | 21,200 | | $31,884.240000 |

In total, Michael currently possesses 20,200 shares of Just for Feet stock and has losses amounting to $ 311,133.07.[32]

*William T. Moor.*

William T. Moor ("Moor") made the following purchases of Just for Feet common stock during the class period:

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|------|------------------|-----------------|-------|
| 08/19/97 | 1,000 | $15.750000 | $15,750.000000 |
| 08/27/98 | 1,000 | $13.000000 | $13,000.000000 |
| 09/25/98 | 1,000 | $13.000000 | $13,000.000000 |
| 12/29/98 | 1,000 | $14.500000 | $14,500.000000 |
| 01/15/99 | 1,000 | $17.375000 | $17,375.000000 |
| 02/26/99 | 1,000 | $10.250000 | $10,250.000000 |
| 05/06/99 | 2,000 | $10.625000 | $21,250.000000 |
| 10/18/99 | 3,000 | $1.843750 | $5,531.250000 |
| TOTALS | 11,000 | | $110,656.250000 |

During the relevant period, then, Moor purchased 11,000 shares of stock. He claims losses of $110,656.25.

---

[32] This amount differs from the amount of loss posited by the Group. In calculating loss, the Group lumped together all of Michael's purchases and sales to come to an total figure of $ 287,739.95 in losses. This would only be appropriate if the purchases and sales of shares made at a profit could be offset from the loss calculated by the Court. However, a plaintiff's claim is determined on the basis of each individual share; just as a plaintiff is not required to offset the gain realized from a contract that has not been breached by a defendant against the losses accrued from those contracts actually breached by the defendant. Further, these purchases and sales occur at an earlier period in the class, during which time any purported deception of Feet would not have been revealed. Only those losses that accrue after the deception is revealed and injury is caused can be remedied. As such, Michael's alleged gains during the early period of his trading cannot be offset against his purported losses.

*James A. Taylor.*

James A. Taylor ("Taylor") has, since January 20, 1999, twice purchased Just for Feet common stock.

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 01/20/99 | 10,000 | $18.125000 | $181,250.000000 |
| 02/26/99 | 10,000 | $10.125000 | $101,250.000000 |
| TOTALS | 20,000 | | $282,500.000000 |

Taylor apparently never sold any of this stock. As such, he claims losses of $ 282,500.00.

*Woods Hardware, Inc., Pension Plan.*

On January 23, 1998, the Woods Hardware, Inc., Pension Plan ("WHIPP") bought two thousand (2,000) shares of Feet common stock at a per-share price of $ 13.437, paying a total of $ 26.874.00. On March 20, 1998, WHIPP sold those shares at $ 15.00 per share, gaining a profit of $ 3,126.00 on the sale. On September 24, 1998, WHIPP again invested in Feet common stock, this time purchasing two thousand (2,000) shares at a price of $ 13.75 per share, paying in total $ 27,500.00. On November 20, 1988, WHIPP sold these shares, realizing a gain of $ 2,500.00.

Beginning on January 22, 1999, WHIPP made further purchases of Feet stock, but this time never sold any of its shares.

| DATE | SHARES PURCHASED | PRICE PER SHARE | TOTAL |
|---|---|---|---|
| 01/22/99 | 3,000 | $14.688000 | $44,064.000000 |
| 02/22/99 | 2,000 | $11.688000 | $23,376.000000 |
| 05/21/99 | 5,000 | $10.313000 | $51,565.000000 |
| 07/20/99 | 4,000 | $5.313000 | $21,252.000000 |
| TOTALS | 14,000 | | $140,257.000000 |

The total amount paid in these later purchases constitutes WHIPP's total losses.[33]

The Group, broadly conceived, consists of almost three hundred individuals and institutions. Other than the fact that they have all purchased shares of Just for Feet common stock, nothing unites them into a common whole. There is nothing to indicate that all three hundred have ever communicated among themselves regarding this litigation or that the three hundred have, with unanimous or majority voice, directed proposed counsel for the Group to perform or not perform any act. There is no indication that the three hundred have elected the twelve-person "steering committee" to represent their unified interest. The Group, defined as consisting of the three hundred purchasers, is simply an agglomeration consisting of those individuals who either responded to newspaper articles about this action or to a notice broadcast by purported counsel concerning this litigation. In short, the Group is a welter, and nothing more.

## Contentions & Analysis

The motions presently under consideration require application of one of a number of amendments to the Exchange Act put in place by the 1995 Reform Act. As has been consistently noted by the circuit and district courts endeavoring to apply those amendments, the Reform Act was enacted in 1995 in response to observed widespread abuses of the federal securities laws in the filing of class actions. See *Greebel v. FTP*

---

[33] Here, as with Michael, the Group attempts to state an amount lower than the losses on particular shares of stock purchased by WHIPP, instead attempting to amalgamate the entire amount of shares purchased during the class period for purposes of demonstrating a string of losses across the entire class period. However, those shares bought and sold while the price of the shares was purportedly buoyed by the alleged false representations of the Defendants cannot claim a cause of action based upon those sales. Nor do those amounts count as offsets to any recovery on those actual losses caused by the misrepresentations.

*Software, Inc.*, 194 F.3d 185, 191 (1st Cir. 1999) ("The enactment of the [Reform Act] in 1995 marked a bipartisan effort to curb abuse in private securities lawsuits. . . ."); *In re Comshare Inc. Securities Litigation*, 183 F.3d 542, 548 (6th Cir. 1999) (reiterating that the purpose of the Reform Act was to put anti-abuse mechanisms in place in federal securities fraud litigation); *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 978 (9th Cir. 1999)(noting that "Congress designed the [Reform Act] to deter non-meritorious lawsuits by creating procedural barriers" to suit); *Mitchell v. Complete Management, Inc.*, 1999 WL 728678 at * 2 (S.D.N.Y. 1999) ("In 1995, Congress enacted the [Reform Act] in response to perceived abuses in securities fraud class actions."); *King v. Livent, Inc.*, 36 F. Supp.2d 187, 190 (E.D.N.Y. 1999) ("According to its legislative history, the [Reform Act] was enacted in response to perceived abuses of the class action procedure."); *In re Oxford Health Plans, Inc. Securities Litigation*, 182 F.R.D. 42, 43 (S.D.N.Y. 1998) (same); and *Fischler v. AmSouth Bancorporation*, 1997 WL 118429 at *1 (M.D. Fla. 1997) (same). To Congress, the 1980's and the early 1990's had seen a proliferation of "strike suits" — class actions initiated and driven by attorneys, the principle goals of which were to obtain settlements favorable to those attorneys, rather than to benefit arguably aggrieved shareholders.[34] See *Greebel v. FTP Software, Inc.*, 194 F.3d at 191; *In re Network Associates, Inc., Securities Litigation*, 76 F. Supp.2d 1017, 1032 (N.D. Cal. 1999); *Harford County, Maryland v. Mid-State Bank & Trust Co.*, 1999 WL 704116 at * 2 (W.D. Pa. 1999); and *Tyrone Area School District v. Mid-State Bank & Trust Co.*, 1999 WL 703729 at *3 (reciting testimony of the Committee on Banking, Housing and Urban Affairs that "'today certain

---

[34] As defined by BLACK'S LAW DICTIONARY, a strike suit is "[a] suit (especially a derivative action) often based on no valid claim, brought either for nuisance value or as leverage to obtain a favorable or inflated settlement." BLACK'S LAW DICTIONARY (7th deluxe ed. 1999). Another, more pointed definition, propounded by a district court in the District of Puerto Rico, is that "[a] strike suit is a largely groundless claim brought by a plaintiff who later engages in extensive discovery to induce the defendant to settle rather than to discover relevant evidence of fraud." *Rivera v. Clark Melvin Securities Corp.*, 59 F. Supp. 2d 280, 287 (D. Puerto Rico 1999).

lawyers file frivolous 'strike' suits alleging violations of Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation.'" (internal citations omitted)). Congress noted that often, when the release of news that misfortune had befallen a target company caused an drop in the value of that company's stock, one or more strike suits would be filed within the same day, containing superfluous allegations that demonstrated little prior investigation by counsel. See *Harford County, Maryland v. Mid-State Bank & Trust Co.*, 1999 WL 704116 at * 2; and *Lirette v. Shiva Corp.*, 27 F.Supp. 268, 274 (D. Mass. 1998). See also the Senate Report on the Reform Act, S. Rep. No. 98, 104th Congress, 1[st] Sess. 8, reprinted in 1995 U.S.C.C.A.N. 679, 687 (the "Senate Report") ("One study concluded that, in the early 1980's, every company in one business sector that suffered a market loss of $ 20 million or more in its capitalization was sued."). A telling example of this practice is recounted by a pair of commentators writing on the heels of the Reform Act's passage:

> A typical example involved Philip Morris. On the morning of Friday, April 2, 1993, Philip Morris announced a forty-cent reduction in the price of a pack of Marlboro cigarettes. It anticipated that, as a result, operating earnings for 1993 would be down as much as forty percent. Less than five hours later, at 1:25 p.m., a class suit was filed. Four more suits were filed the same day. On Monday, April 5, five additional suits were commenced, bringing the total number of class actions to ten within three days. The court noted caustically that in the few hours counsel devoted to getting the initial complaints to the courthouse, overlooked was the fact that two of them contained identical allegations, apparently lodged in counsel's computer memory of 'fraud' form complaints, that the defendants here engaged in conduct 'to create and prolong the illusion of [Philip Morris'] success in the toy industry.'

Richard M. Phillips and Gilbert C. Miller, *The Private Securities Litigation Reform Act of 1995: Rebalancing Litigation Risks and Rewards for Class Action Plaintiffs, Defendants and Lawyers*, 51 BUS. LAW. 1009, 1011-12 (1996).

Thus the perception had developed that securities plaintiffs' attorneys had hijacked the law governing securities fraud, see *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 58 (D. Mass. 1996), turning the federal courts into instruments through which to extract large settlements. The process of extraction was viewed by Congress as being relatively cost-free for plaintiffs' counsel — hastily drafted and barely researched complaints would cost such counsel little and settlement, often cheaper for the defendant companies than discovery and legal fees, would normally be forthcoming long before any costly work commenced. Indeed, it appeared that the only prerequisite to being a successful — that is, profitable — plaintiffs' attorney specializing in securities litigation was the ownership of a good pair of running shoes, as generally only the first attorney to file at the courthouse would win the "privilege" of maintaining the securities class action. See *In re Milestone Scientific Securities Litigation*, 183 F.R.D. 404, 412 (D.N.J. 1998); and Conference Report on Securities Litigation Reform, H.R. Rep. No. 369, 104th Congress, 1st Sess. 31, reprinted in 1995 U.S.C.C.A.N. 679, 689 (the "Conference Report").

The absolute control exercised by plaintiffs' attorneys over the class securities litigation process was apparent at each stage of litigation. Further, because of their extensive control over class actions, counsel could wrest from target companies bloated settlements that were strong on attorneys' fees, but light on shareholder compensation. The Senate Report highlighted Congress's concern over this problem:

> Under the current system, the initiative for filing 10b-5 suits comes almost entirely from the lawyers, not from genuine investors. Lawyers typically rely on repeat, or "professional," plaintiffs who, because they own a token number of shares in many companies, regularly lend their names to lawsuits. Even worse, investors in the class usually have great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers can decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients.
>
> Numerous studies show that investors recover only 7 to 14 cents for every dollar lost as a result of securities fraud. Indeed, a 1994 Securities Subcommittee

> Staff Report found "evidence * * * that plaintiffs' counsel in many instances litigate
> with a view toward ensuring payment for their services without sufficient regard
> to whether their clients are receiving adequate compensation in light of evidence
> of wrongdoing." The comment by one plaintiffs' lawyer- "I have the greatest
> practice of law in the world. I have no clients." -aptly summarizes this flaw in the
> current system.

Senate Report at 6, 1995 U.S.C.C.A.N. at 685 (internal footnotes omitted). Thus, as stated by one district court, class securities litigation had become "typically initiated and controlled by plaintiff's counsel, bark to core, start to finish." *In re Network Associates, Inc., Securities Litigation*, 76 F. Supp. 2d at 1020. In arguably meritorious cases, the shareholders were ill-represented by attorneys whose recoveries were adequate only to compensate the attorneys themselves. In the more frivolous actions, the harm caused to shareholders was more egregious, as those shareholders were indirectly required to foot the substantial legal bills of counsel retained only nominally on their behalf.[35]

One cause of the ascendance of counsel-driven securities class litigation was seen to be the relative inability or unwillingness of named plaintiffs in such cases to oversee the activities of their attorneys. See *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845, 850 (S.D. Ind. 1999) and *In re Milestone Scientific Securities Litigation*, 187 F.R.D. 165, 174 (D.N.J. 1999) ("*Milestone II*") (stating that "[o]ne objective of the [Reform Act] was to ensure more effective representation of the interests of investors in private securities class actions"). This lack of oversight was largely attributed to attorneys' "employment" of so-called "professional plaintiffs," the proliferation of whom "made it particularly easy for lawyers to find individuals willing to play the role of wronged investor for purposes of filing a

---

[35]     The "victims" on whose behalf these lawsuits are allegedly brought
         often  receive only pennies on the dollar in damages. Even worse,
         long-term investors ultimately end up paying the costs associated
         with the lawsuits.

S. Rep. at 9, 1995 U.S.C.C.A.N. at 688.

class action lawsuit." Senate Report at 10, 1995 U.S.C.C.A.N. at 689.[36]  See *King v. Livent, Inc.*, 36 F. Supp. 2d 187, 190 (S.D.N.Y. 1999); *Milestone I*, 183 F.R.D. at 411; and *Greebel v. FTP Software, Inc.*, 939 F. Supp. at 61.  The district court in *In re Telxon Corporation Securities Litigation*, 67 F. Supp. 2d at 814, described the problems caused by permitting "professional plaintiffs" to act as representative plaintiffs in securities fraud litigation:

> Reference to the academic literature in existence at the time the [Reform Act] was passed is useful in understanding the evil Congress perceived and the problems it sought to address with the Act. The problem with "professional plaintiffs" stems from their relatively nominal interest in securities class action litigation vis a vis the relatively large interest at stake for their attorney. Whereas the plaintiff with only a few shares of stock might have suffered losses amounting to no more than one hundred dollars, even less in some instances, the attorney's interest generally is much greater because of the aggregation of all claims in the class. This divergence of financial interests creates significant agency costs on a lead plaintiff with respect to his ability to monitor the attorney's conduct during the prosecution of a securities class action. As professors Weiss and Beckerman explain:
>
>> [A] named plaintiff who has only a nominal financial interest in a class action, especially a plaintiff that an attorney has "recruited," is unlikely to monitor effectively her attorney's prosecution of the action or the terms on which her attorney recommends that the action be settled. Indeed, attorneys generally can influence strongly, if not control, the terms on which their clients agree to settle suits other than class actions because an attorney's knowledge about the law and how it applies to the facts almost always is superior to that

---

[36] The term "professional plaintiff" refers to an individual with few holdings in a targeted company who will, in exchange for a large share of the class recovery, allow his or her name to be associated with the lawsuit as a nominal representative plaintiff. Such plaintiffs often appeared in multiple actions over short periods of time. "The term professional plaintiff generally is used to refer to a plaintiff who is either a frequent filer (in the years before the [Reform Act], some plaintiffs would file upwards of twenty or thirty securities class action complaints in only a few years), or a 'hired gun' (one who allows an attorney to sue in his name in exchange for a fee), or both." *In re Telxon Corporation Securities Litigation*, 67 F. Supp. 2d 803, 813 (N. D. Ohio 1999).

of her client. In other kinds of litigation, however, a lawyer's ability to succeed often will depend to some degree on her client's cooperation. Moreover, the client, in principle if not in fact, retains the power to accept or reject any settlement her lawyer recommends. The client also has the power to bargain with her lawyer, in advance, about the terms on which the lawyer will be compensated.

None of these constraints is present when class actions are settled. Plaintiff's attorneys typically do not rely on named plaintiffs for vital testimony, do not bargain with named plaintiffs over the fees they will be paid, and do not require named plaintiffs' approval of the terms on which they propose to settle class actions.

[Elliot J. Weiss and John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 YALE L.J. 2053, 2065 (1995)] (internal footnotes omitted). In addition, "[m]embers of the plaintiff class in a large class action or shareholder's derivative suit often have claims so small that the litigation is a matter of relative unimportance to them. Even though the claims in the aggregate may be very large, the small size of the individual claims creates enormous free-rider effects: no rational plaintiff would take on the role of litigation monitor because she would incur all the costs of doing so but would realize only her pro rata share of the benefits." Jonathan R. Macey and Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. CHI. L. REV. 1, 19-20 (1991). "These collective action and free-rider effects allow the plaintiffs' attorney in class and derivative cases to operate with nearly total freedom from traditional forms of client monitoring." *Id.* at 20. The Third Circuit echoed this concern in a pre-[Reform Act] derivative action, "[s]hareholders with well-diversified portfolios or small holdings lack the incentive and information to police settlements–the costs of policing typically outweigh any pro rata benefits to the shareholder." *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1309 (3ᵈ Cir. 1993). See also *id.* at 1309 n. 9 ("Generally, the costs of monitoring will exceed the pro rata benefit to any single shareholder even though they may be lower than the benefits to all.").

In response to the problems apparently engendered by the presence of professional plaintiffs unable and unwilling to control class counsel in securities fraud litigation,

Congress enacted the lead plaintiff provisions of the Reform Act. Section 21D of the Exchange Act, as amended by the Reform Act, requires that a district court "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members. . . ." 15 U.S.C. § 78u-4(a)(3)(B)(i). Rather than selecting as the governing plaintiff in a securities class action the first plaintiff to reach the courthouse door, the district court is to choose the most adequate plaintiff to oversee the litigation. Appointment of the most adequate plaintiff is meant to empower investors by placing behind the driver's seat on the plaintiffs' side an experienced investor or capable investors who have substantial and genuine interests in the outcome of the litigation. See *In re Telxon Corporation Securities Litigation*, 67 F. Supp. 2d at 815 ("The effect of this provision is to place the leadership of the class in the hands of a plaintiff who has suffered a large enough pro rata loss that he will benefit from monitoring his attorneys' conduct."); and *In re Party City Securities Litigation*, 189 F.R.D. 91, 103 (D.N.J. 1999) ("Specifically, the [Reform Act] provides a method for identifying the plaintiff or plaintiffs who are most strongly aligned with the class of shareholders, and most capable of controlling the selection and activities of counsel.").

However, the aftermath of the Reform Act's enactment has not seen the widespread changes hoped for by Congress. Rather, counsel, attempting to get around the barricades placed before them by the Reform Act, have taken to publishing notices imploring large numbers of class members to respond and utilizing those responses to create large plaintiffs' groups. The district court in *In re Network Associates, Inc., Securities Litigation*, 76 F. Supp. 2d at 1021-22, provides an insightful description of this practice, which bears many similarities to the approaches taken by counsel in the instant action:

> Since 1995 when the [Reform Act] was approved, there have, in fact, been some instances of large institutional investors advancing themselves and being selected as lead plaintiffs. E.g., *Gluck v. Cellstar Corporation*, 976 F.Supp. 542

(N.D. Tex. 1997) (appointing State of Wisconsin Investment Board). For the most part, however, a different pattern altogether has developed, one that remarkably resembles the old regime. As was true before the [Reform Act], in the wake of a substantial drop in any publically-traded stock, dozens of class suits are typically filed. Unlike before, however, the [Reform Act] requires the plaintiff in the first-filed suit to publish the statutory initial notice to invite lead plaintiff candidates to step forward. Although this notice was expected by Congress to be published once and to encourage uninvolved investors to come forward and to compete for the lead role, the notices in practice extol the lawyer filing suit, and invite the investor to fill out a form and return it to the lawyer. Each lawyer competes to accumulate as many forms as possible in order to amass the largest "group" possible. Not only does the first counsel to file give notice but so do many other lawyers filing suit, not once but over and again, all in an effort to compile the largest portfolio of investor names. The race to the courthouse has been replaced by a race to both the courthouse and thence to the publisher.

The [Reform Act] did not authorize or contemplate such a process. Instead, it called for notice to affected investors so they could decide whether to seek the role of lead plaintiff on their own. In practice, however, the real purpose and effect of the forms is to steer investors away from seeking the lead role on their own and to steer them toward registering with a lawyer who already has a lead plaintiff candidate. One of the forms used in this case, for example, states in part that the investor has reviewed the complaint and "If necessary, I authorize the filing of a similar complaint on my behalf. * * * I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary." The form does not specifically state that the investor wishes to take on the responsibility for being the lead plaintiff, nor does it specifically authorize and retain any particular counsel to seek such a responsibility on their behalf. *To the extent an investor truly seeks the role of lead, a legitimate question arises whether one law firm (or single set of law firms) could represent all of them without irreconcilable conflicts, given that not every candidate could be advanced and counsel would have to dash the hopes of one or more seeking the job.* The forms make no disclosure of this problem. Nor do they include a waiver of any conflict.

This form-submitting process bears a resemblance to the claim-submitting process that traditionally has occurred at the end of class litigation. The only information required to be written in by the investor in the form mentioned was the name of the investor and the number of shares purchased or sold, the price,

and the date. The rest is boilerplate. In this connection, one class counsel candidate herein accuses another of disguising its notices so as to cause investors to believe that returning the form is a prerequisite to participation in any ultimate recovery–when it plainly is not under the law. *No doubt, many send in the forms thinking they need to in order to participate in any recovery.*

When the motions to appoint lead counsel are made, as here, these forms are then bound into numerous thick booklets as alleged documentary support for counsel's motion on behalf of a group of movants, as has been done in this case. Counsel argue that the group as a whole has a large stake in the outcome — therefore, the group should be the presumptive lead plaintiff.

*The only thing the investors in any group have in common, however, is the lawyer. They have no link to each other. They are not organized with any group decisionmaking apparatus. They attended no organizing meetings. They have no cohesive identity. They have no name other than one arbitrarily selected by the lawyers. They do not, in all probability, even know they belong to a group or know its name or know how their form is being used. The group name is not on the published notice, nor in the form returned to counsel. The name is invented after the fact by counsel. In the present case, in the process of challenging each other's group, one side herein obtained declarations from several institutions recanting their forms, saying they were misled by opposing counsel. With thousands of forms submitted in heavy boxes to the Court, and with no discovery conducted as to the bona fides of any, the truth is that there is no way to check the accuracy of the forms or the accuracy of the claimed totals.* Indeed, the Milberg volumes are accused of including numerous discrepancies, ranging from unsigned forms, to forms refusing to be a lead plaintiff, to trades that could not have occurred as represented (due to Sunday dates, etc.). These defects are only those that appear on the face of the forms without the benefit of discovery.

Counsel invariably insert the word "group" into the title of the ensemble, as in "Network Institutional Group" or the "Network Associates Lead Plaintiff Group." This usage lends an appearance of tying into the statutory wording that the lead plaintiff may be a "person or group of persons," a phrase to be discussed momentarily. Counsel then urge, as here, that the group with the largest aggregate losses should dictate the selection of lead plaintiff.

*Id.* at 1021-22 (emphasis added).

A district court must exercise exceptional care to insure that in applying the lead plaintiff provisions of the statute, the concerns that motivated Congress are carefully

heeded, as the determination of lead plaintiff by the district court is, with probably little exception, not immediately subject to review. See *Metro Services, Inc., v. Wiggins*, 158 F.3d 162, 165 (2$^d$ Cir. 1998) (concluding that the determination of lead plaintiff by a district court does not constitute an appealable final decision) and *Pindus v. Fleming Companies Inc.*, 146 F.3d 1224, 1226-27 (10th Cir. 1998) (refusing to review a district court's determination of lead plaintiff as either a final order or on writ of mandamus). Likely, a district court's determination of lead plaintiff and lead counsel can be visited by the appellate court only after the district court has approved a contested settlement agreement or after trial, by which time a tremendous amount of money has been expended by both sides to the litigation.[37]   As such, in determining lead plaintiff, this Court must be inordinately careful, making certain that the requirements of section 21D(a) are assiduously applied in line with the purposes of Congress in the enactment of the 1995 Reform Act.

**Notice.**

The domain of individuals and institutions from which a district court may draw the most adequate plaintiff to serve as lead plaintiff is a limited one, confined to those individuals or institutions that either filed a complaint in the action or properly responded to notice published pursuant to subsection 21D(a)(3)(A)(i).  15 U.S.C. § 78u-4(a)(3)(A)(i) & (B)(iii)(I).  This notice is to be published by the first plaintiff to file an action in the district court and the publication is to be made "in a widely circulated national business-oriented publication or wire service. . . ."   15 U.S.C. § 78u-4(a)(3)(A)(i).

---

[37] Indeed, there is a case presently before the Eleventh Circuit Court of Appeals, *Chalmers v. Digital Lightwave, Inc.*, No. 99-11293-FF, in which an approved settlement is being challenged because that settlement was arrived at by a lead plaintiff group and lead counsel that had been inappropriately appointed and overseen.  While, on or about March 20, 2000, a portion of the action was dismissed by the Circuit Court, it appears that the matters related to the selection of lead plaintiff and lead counsel remain.

"The purpose of this is to enable investors to intervene in the litigation and take charge of it by, among other things, selecting the lawyers to represent the class and setting the terms of their compensation." *Ravens v. Iftkar*, 174 F.R.D. 651, 653 (N.D. Cal. 1997).

In the instant action, after filing their respective complaints, both the *Burke* plaintiffs and the *Massey* plaintiff published notice of the pending litigation in an attempt to comply with subsection 21D(a)(3)(A)(i). While each notice issued seems to have attracted the attention of the movants, neither satisfies the requirements of the subsection. The subsection provides that:

(i) In general
Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class--
    (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
    (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

15 U.S.C. § 78u-4(a)(3)(A)(i). Under this section, proper notice must (1) be properly published; (2) advise members of the putative class of the relevant details of (a) the pendency of the action, (b) the claims asserted therein, and (c) the period of the action; and (3) inform putative class members that they have the right to move the district court to serve as lead plaintiff in the class action.

"As a first principle, courts applying the [Reform Act] should draw on this legislative history and purpose in interpreting its provisions." R. Chris Heck, *Comment: Conflict and Aggregation: Appointing Institutional Investors as Sole Lead Plaintiffs under the [Reform Act]*, 66 U. Chi. L. Rev. 1199, 1217 (1999). The obvious and primary goal with which subsection 21D(a)(3)(A)(i) was drafted was that of encouraging the most adequate plaintiff to step forward and control the litigation. Several things must be accomplished

by any notice that is to fulfill this goal. First, it must reach the broadest number of possible investors, within reason, or, if it is not broadly-disseminated, its distribution must at least be sufficiently broad to attract the attention of regular investors with specialized knowledge of the market and a large stake in the litigation referred to in the notice. Either type of notice is of a kind likely to attract the attention of individuals who typify the most adequate plaintiff — experienced, large investors in securities of the subject company. Thus, notice published "in a widely circulated national business-oriented publication or wire service" must be of a sort likely to reach experienced, large investors, preferred as adequate plaintiffs, even if such notice is not fully *broad* — that is, calculated to reach every investor in the securities that are the subject of the litigation. The language of the subsection regarding publication of notice is an instruction on exactly what publication will fulfill the aim of notifying presumptively adequate plaintiffs.

Second, for the most adequate plaintiff to step forward and take control of the litigation as lead plaintiff, that institution or individual must be informed that he, she, or it enjoys a right to move the district court to serve as lead plaintiff. At the same time, any potential lead plaintiff may exaggerate his, her, or its claims and will be unable to weigh his, her, or its losses with respect to other potential lead plaintiffs, hampering that investor's ability to fully evaluate his, her, or its adequacy to serve as lead plaintiff. The requirement that published notice inform putative class members generally of a right to move the district court to serve as lead plaintiff attempts to address these aims.[38]

For an investor to make an intelligent determination of whether he, she, or it will move a court to be appointed lead plaintiff, that investor must have all relevant information that would inform such a choice. Further, attempts to minimize the costs

---

[38] Further, in line with these interests, notice that informs class members of a right to move to be appointed lead plaintiff such as to encourage more persons to apply to be appointed as lead plaintiff is to be favored over notice that encourages fewer persons to apply as lead plaintiff.

associated with the provision of such information should be made, one, as high costs associated with information gathering may deter many potential lead plaintiff contenders from evaluating their competence to serve as lead plaintiff and, two, as multiple contenders must to evaluate much of the same information to determine whether they wish to serve as lead plaintiff, raising the possibility of redundant expenditures made to acquire relevant information.  Third, therefore, notice, if it is to encourage the most adequate plaintiff to act as lead plaintiff in any litigation, must provide sufficient information to an investor through which that investor may determine his, her, or its ability to serve as lead plaintiff, and minimize the costs to each investor in obtaining and evaluating information relevant to the adequacy determination of the investor.

Section 21D(a)(3)(A)(i)(I) seeks to satisfy the demand that all investors have or be able to obtain information sufficient to make a minimal determination of adequacy by requiring that notice apprize members of the putative class "of the pendency of the action, the claims asserted therein, and the purported class period."  In the absence of a clarifying principle, the obligations placed upon named plaintiffs by the subsection are, at best, sketchy.  However, the general goals lying behind the notice provision informs the interpretation of the subsection, giving flesh to its bones.

Without further developing the meanings of the component phrases of this subsection here, there exist two comprehensive means of interpreting the subsection, consonant both with the notice provision's general goal of encouraging the most adequate plaintiff to step forward and assert control over the litigation and with its more specific aim of providing investors adequate information upon which to make the decision to move to be appointed as lead plaintiff. First, notice satisfying subsection 21D(a)(3)(A)(i)(I) can be interpreted broadly to require full disclosure of all of the information relevant to the pendency of the action, the claims in the action, and the period of the class.  This interpretation would clearly satisfy the notice provision's aims, as any notice published

would provide all of the information from which a prospective lead plaintiff could, to the best degree, evaluate his or her adequacy to serve as lead plaintiff. Robust notice is clearly the best notice, fully minimizing costs to all potential lead plaintiffs and thereby maximizing the number of investors who would evaluate their competence (and give interested investors better grounds from which they could reasonably qualify or disqualify themselves as potential lead plaintiffs). Nonetheless, because of the costs which named plaintiffs may have to incur in the publication of such notice, it seems more than is required by the language in the subsection.

Subsection 21D(a)(3)(A)(i)(I) could also be interpreted in such a way that information about the "the pendency of the action, the claims asserted therein, and the purported class period" merely be enough to permit reasonable investors to decide whether they wish to perform further investigation — that is, sufficient information from which to make a minimal determination of adequacy — and to direct them to further sources of information. Thus, for example, in determining whether a notice has satisfied the requirement that it advise putative class members of "the pendency of the action," that notice must, at a minimum, provide information about the pendency of the action that would be useful to an interested investor in making an initial evaluation of lead plaintiff suitability and/or in directing the investor to further information. This is accomplished by a notice containing information about who has filed the suit, who is being sued, the court in which the suit is taking place, and the civil action number of the case.[39] This

---

[39] Beyond the notice, there are few sources to which potential lead plaintiffs may turn in obtaining information about the litigation such that they may make an informed decision about assuming the role of lead plaintiff: Putative class members can examine the complaint, they can contact the attorneys handling the case, or they can engage in their own investigation of the matters undertaken by the company that sold the stated securities during the class period (or any combination of the three). The first and second means of obtaining further information are inexpensive and, given adequate information in these sources, are the best items from which information may be obtained. The third source of information will generally be cost-prohibitive at the lead plaintiff stage, as the costs of such investigation are excessive in light of the possibility

interpretation would seem to accord with the purposes of the notice requirement, in that it gives members of the putative class sufficient information from which to make basic decisions about deciding whether to act as lead plaintiff while not requiring the named plaintiff, who may not be chosen lead plaintiff, to expend too many of his, her or its resources in publishing a notice that is wastefully extensive.[40]

---

that an investor may, after the investigation, chose not to move to be appointed lead plaintiff or, after making a motion, may not be chosen by the district court as a lead plaintiff. An interpretation of the subsection that limits waste of time and resources is to be favored. At a minimum, then, in addition to providing sufficient information from which a class member may evaluate whether further investigation is warranted, the notice must be sufficient to direct a member of the purported class to either the complaint or present counsel, which must, in turn, have sufficient information from which that investor can make a reasonable decision regarding moving to be appointed lead plaintiff.

Further, as between providing information directing a member of the purported class to the complaint and directing a member of the class to counsel publishing the notice on behalf of a named plaintiff, for reasons given in the text, *infra*, giving only information directing putative class members to contact counsel would not comport with the purposes of the subsection, although it is likely the least expensive means of obtaining further information from which the decision to move to be appointed lead plaintiff may be had. At a minimum, notice must inform putative class members of where the complaint is filed. Indeed, a putative lead plaintiff must certify to having examined the complaint prior to being considered for the lead plaintiff position. See 15 U.S.C. § 78u-4(a)(2)(A)(i).

Section 21D(a)(3)(A)(i)(I)'s requirement that class members be advised of the "pendency of the action" fulfills this goal and, at the same time, is informed by it. Therefore, notice that advises class members of the "pendency of the action" must provide information about the action pending that aids interested investors in finding the complaint, such as the location of the action, its full name and its style.

[40] An alleged third manner of interpreting subsection 21D(a)(3)(A)(i)(I) would require only minimal information regarding the action, namely information that a suit is pending, that the suit asserts claims under certain of the securities laws and that the class period extends between two dates. If the goal of the subsection is to provide sufficient information to interested investors to permit them, with minimal costs, to make an informed decision of whether to move to be appointed lead plaintiff, reading the subsection to require only absolutely minimal information would impose the further requirement that the notice provide a means of finding additional information that minimizes costs, either by directing putative class members to the complaint or to attorneys. However, this manner of interpreting the subsection is inadequate because it does not provide sufficient information from which potential lead plaintiffs can evaluate adequacy as an initial matter without either requiring each interested investor to redundantly and perhaps

SWIB and the Group (however defined) filed their motions to serve as lead plaintiff within sixty days of publication of the following by the *Burke* plaintiffs and their counsel:

BIRMINGHAM, Ala. – (BUSINESS WIRE) – Nov. 19, 1999 – Ritchie & Rediker, L.L.C., combined with Kilborn & Roebuck and David McDonald, Esq., announced that a securities class action lawsuit was filed today in the United States District Court for the Northern District of Alabama, Southern Division, against certain key officers and controlling personnel of Just for Feet, Inc. (the "Company") (Nasdaq: FEET) and the Company's auditors, Deloitte & Touche, L.L.P., on behalf of purchasers of the Company's common stock during the period of April 1, 1997, through and including November 1, 1999 (the "Class Period"). This action is not brought against the Company, who announced on November 2, 1999, that it was seeking Chapter XI bankruptcy protection.

If you have not already done so, you may wish to contact the undersigned in order to participate in this case. If you already contacted Ritchie & Rediker, you need do nothing further.

The securities class action complaint charges the defendants with violations of the federal securities laws (specifically, sections 10(b) and 20 of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission) by, among other things, misrepresenting and/or omitting material information concerning the Company's net earnings. The complaint further charges that these misrepresentations were the result of the combined defendants actions in, among other things, creating false billings for advertising and fixed asset costs to its vendors, understating its cost of sales through acquisition accounting, capitalizing inventory costs that should have been recorded as expenses, overstating inventory by failing to account for missing or obsolete inventory, and creating fictitious postings to both the inventory and

---

fruitlessly expend time and money on searching out and reviewing the complaint, or violating the requirement that plaintiffs in securities litigation be placed in a position to make all relevant decisions regarding the action rather than counsel.

expense accounts.  The price of Just for Feet's shares were [sic] thereby artificially inflating [sic] during the Class Period.

Plaintiffs seek to recover damages on behalf of class members, and is [sic] represented by, among others, the law firm of Ritchie & Rediker, L.L.C., who have extensive experience and expertise prosecuting complex class actions on behalf of investors and shareholders.  To find out more about the firms history and experience, please visit the web site at www.ritchie-rediker.com and feel free to contact the firm using the information posted on that site.  Another firm participating in this action is Kilborn & Roebuck. . . .  Also participating is David McDonald, Esq. . . .

If you are a member of the class described above, you may seek to join in the above class action on or no later than sixty days from November 19, 1999.

If you would like to receive an information packet, you may call toll-free or otherwise contact [Ritchie & Rediker, L.L.C.]

While the attempted notice by the *Burke* plaintiffs is appropriately published,[41] it is nonetheless defective under section 21D(a)(3)(A)(i). First, the purported notice absolutely fails to inform class members of a right to move the district court to serve as lead plaintiff. The requirement that the notice inform putative class members of their right to move the district court to be appointed lead plaintiff is clearly stated in subsection 21D(a)(3)(A)(i)(II) . Se *In re Olsten Corporation Securities Litigation*, 181 F.R.D. 218, 219 (E.D.N.Y. 1998). As discussed above, this requirement, along with other lead plaintiff provisions of the Reform Act, were put in place to prevent professional plaintiffs and self-serving counsel from hijacking securities actions and forcing unfair settlements down the

---

[41] Publication in a national wire service such as the Business Wire, the service utilized by the *Burke* plaintiffs, is adequate for purposes of satisfying the requirements of section 21D(a)(1)(A)(i). See *In re Nice Systems Securities Litigation*, 188 F.R.D. 206, 216 (D.N.J. 1999) (specifically finding the Business Wire to qualify as a "widely-circulated national business-oriented wire service). In *Nice Systems*, the district court made the following observations about the Business Wire, as a notification device:

> The [Reform Act] does not define "widely-circulated" or "wire service." See 15 U.S.C. § 78u-4(a)(3)(A)(i). Congress, however, intended publication to "encompass a variety of mediums [sic], including wire, electronic, or computer services." See Conference Report at 733; see also *Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 62 (D.Mass.1996). The Business Wire is a business-oriented wire service within the meaning of the [Reform Act]. See *Greebel*, 939 F.Supp. at 62 ("[T]he mere fact that Business Wire arrives at a print publication via an electronic signal, rather than in the manner of a traditional wire service, does not disqualify it as a 'wire service' within the meaning of the statute."). Additionally, the Business Wire is subscribed to by "hundreds of print publications and wire services, encompassing news media in all fifty states," and is thus "widely-circulated." See *id.*; *First Merchants Acceptance Corp.*, 1997 WL 461036 at *4 ("[T]he court must make its own interpretation as to what the term ['widely-circulated'] means."). The Business Wire has been recognized as a suitable vehicle for satisfying the notice and publication requirements of the [Reform Act]. See, e.g., *Greebel*, 939 F.Supp. at 62-64; *Lax v. First Merchants Acceptance Corp.*, [] 1997 WL 461036 at *1 (N.D.Ill. 6 Aug. 1997).

*Id.* at 216 n.8. Further, as this Court would define a "widely-circulated" publication or wire service — a publication or wire service the circulation of which is, at a minimum, sufficiently broad to be read or examined by most large, experienced investors — publication in the Business Wire satisfies the requirements of subsection 21D(a)(3)(A)(i).

throats of defendant companies and shareholders alike. Particularly, as previously stated, section 21D(a)(3)(A) furthers this goal by requiring the first-to-file plaintiff to provide diligent investors with knowledge of pending actions in which those investors have an interest and to explicitly invite them to come forward to take control of the litigation. For notice to satisfy this purpose, it must clearly inform class members of their right to move the district court to act as lead plaintiff. See *In re Nice Systems Securities Litigation*, 188 F.R.D. at 216.

The notice propounded by the *Burke* plaintiffs and, more specifically, their counsel, utterly fails to inform purported class members of a right to move to be appointed lead plaintiff. Rather, the notice published appears to have been drafted with the aim of directing clients to the law firms listed in it, thereby permitting the *Burke* plaintiffs and counsel associated therewith to avoid any lead plaintiff challenge. While the primary goal of the notice provisions is to encourage the most adequate plaintiff to present itself to be appointed the lead plaintiff in the action, the subsection has the further, secondary goal of preventing counsel in the case from taking a commanding role in the litigation. The adage "knowledge is power" has specific application here: Where information relevant to a class member's adequacy determination is held solely by counsel and can only be obtained from counsel, that counsel has tremendous power over the lead plaintiff determination of that class member. Inherent in this power is the possibility of abuse: In disbursing information, counsel may request that it be permitted to represent a class member; the disbursement of information may even be conditioned on an agreement to permit counsel to represent the class member. Counsel may only reveal so much information as is required to dissuade an investor from pursuing lead plaintiff status. Putative class members may be convinced by counsel, through the explanation of claims or of their right to move to be appointed lead plaintiff, that their only hope of recovery

lies in joining an artificially designed plaintiffs' group that will, effectively, be managed by counsel.

Curbing attempts at counsel-driven litigation such as these were a large part of the motivation behind the Reform Act.  Publication by counsel of notice that attempts to skirt this implicit goal by requiring members of the purported class to contact counsel is inherently defective, regardless of whether the demand is made explicitly, through extended exhortation to call counsel, or impliedly, by counsel's failing to include adequate information, such as the class members' right to move the court to be appointed lead plaintiff.

Fully three paragraphs of the attempted notice published by the *Burke* plaintiffs — half of those contained in that notice — directly importune putative class members to contact the listed law firms.  The second longest paragraph in the notice is little but an advertisement, extolling the "experience and expertise" of the named firms.  In one paragraph, the alleged notice even goes so far as to inform the putative class members that they "may seek to join in the above class action on or no later than sixty days from November 19, 1999," seemingly indicating that putative class members should contact the listed law firms or lose any right in class-wide relief.  Not only does the published notice fail to encourage potential lead plaintiffs to come forward, it accomplishes the opposite result.

The attempted notice published by the *Burke* plaintiffs fails in another respect, though not nearly so much as the notice published by the *Massey* plaintiff and his counsel. While adequately informing putative class members of the class period and where the class action was filed, the notice does not fully inform potential lead plaintiffs either of the names of the plaintiffs, the names of the defendants or style of the case.  Thus, while the notice adequately states the purported class period, it fails to indicate "the pendency of the action," as it does not indicate exactly *what* action is pending, only that one exists

somewhere in the district court for Northern District of Alabama against some defendants who are officers and directors of Just for Feet.  To learn the particulars of the action, potential lead plaintiffs must either search through the files of the district courts of the Northern District of Alabama or contact the law firms prominently listed in the purported notice.  As such, the notice published by the *Burke* plaintiffs is defective.[42]

The notice published by the *Massey* plaintiff and his counsel is hardly better.  This notice, published on November 24, 1999, nearly one hour after the *Massey* complaint was filed, states:

> **Milberg Weiss Announces Class Action On Behalf of Purchasers of Just For Feet, Inc. Common Stock**
> **The Following is an Announcement by the Law Firm of Milberg Weiss:**
> NEW YORK – (BUSINESS WIRE) – Nov. 24, 1999 – Notice is hereby given that a class action lawsuit was filed on November 24, 1999, in the United States District Court for the *Southern* District of Alabama, on behalf of all persons who purchased or otherwise acquired the common stock of Just for Feet, Inc. ("Feet" or the "Company") (Nasdaq: <u>FEETQ</u> - <u>news</u>) between May 5, 1997, and November 1, 1999, inclusive (the "Class Period").  If you wish to discuss this action or have any questions concerning this notice or your rights or interests with respect to these matters, please contact, at Milberg Weiss Bershad Hynes & Lerach ("Milberg Weiss"), Steven G. Schulman or Samuel H. Rudman at One Pennsylvania Plaza, 49th Floor, New York, New York 10119-0165, by telephone 1-800-320-5081 or via e-mail: <u>endfraud@mwbhlny.com</u> or visit our website at <u>www.milberg.com.</u>
> The complaint charges certain of Feet's senior officers and directors with violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  The complaint alleges that defendants issued a series of materially false and misleading statements

---

[42]    The Court does not address whether the *Burke* plaintiffs' notice satisfies the requirement that such notice advise putative class members of the claims asserted in the action.

concerning the Comapny's operations and financial condition. As a result of these materially false and misleading statements the price of Feet common stock was artificially inflated during the Class period. Prior to the disclosure of the adverse facts described above Feet completed a $200 million debt offering and certain Company insiders realized over $ 5.8 million in proceeds from the sale of Feet common stock to the general investing at artificially inflated prices.

Plaintiff seeks to recover damages on behalf of class members and is represented by the law firm of Milberg Weiss, among others. Wilberg Weiss maintains offices in New York City, San Diego, Los Angeles, San Francisco and Boca Raton and is active in major litigations pending in federal and state courts thoughout the United States. Milberg Weiss has taken a leading role in numerous important actions on behalf of defrauded investors, and is responsible for a number of outstanding recoveries which, in the aggregate, total approximately $ 2 billion. For more information about Milberg Weiss, please visit our website at www.milberg.com.

If you are a member of the class described above you may, not later than sixty days from November 19, 1999, move the Court to serve as lead plaintiff of the class, if you so choose. In order to serve as lead plaintiff, you must meet certain legal requirements.

(Emphasis added.)

While this notice is properly published and, unlike the *Burke* plaintiffs' notice, informs class members that they have the right to move the district court to be appointed lead plaintiff, it neither informs class members of "the pendency of the *action*" nor fairly apprizes them of "the claims asserted therein. . . ." 15 U.S.C. § 78u-4(a)(3)(A)(i)(I). As stated above, to notify class members of "the pendency of the action," the plaintiff or plaintiffs publishing the notice must not only indicate that a case on behalf of a certain group of shareholders is pending, but *where* the action is pending and the full name and style of the pending action. The notice published by the *Massey* plaintiff not only neglects to provide this information, it provides inaccurate information. First, the notice

published by the *Massey* plaintiff and his counsel fails to indicate who is seeking relief and against whom relief is sought, facts that would be revealed were the entire name of the action included in the notice.[43] A casual observer of the notice might even conclude that Just for Feet is a corporate defendant in the pending action. Without inclusion of the name or style of the action in the notice, an interested investor who even knew of the district in which the case was filed would have a difficult time searching for the action (particularly at a distance), in order that he, she or it might examine the complaint and determine if the case is one in which he, she, or it wished to assert control as lead plaintiff.

Second, beyond simply neglecting to include the name of the court in which the case was filed, the notice misstates the designation of the district containing this Court, referring to it as the "Southern District of Alabama." A member of the purported class attempting to locate where the suit is pending on the basis of this information would have no choice but to contact *Massey* plaintiff's counsel and potentially be subjected to attempts by that counsel to recruit the class member into the plaintiffs' group manufactured by that counsel.

Third, while the notice lists the sections of the Exchange Act upon which the class claims are founded and informs members of the putative class that the claims stem from misrepresentations made by directors and officers of Just for Feet, there is no explanation of these claims. The notice does not list each alleged misrepresentation or generally describe those misrepresentations such that an interested investor might be able identify the misrepresentations. The notice does not contain a general explanation of how the misrepresentations were manufactured or disguised. Finally, while the notice seems to

---

[43] The notice also seems to acknowledge the existence of the earlier *Burke* action, filed on November 19, 1999, and assumes that the *Massey* case and it would eventually be consolidated, as it notifies investors to contact the Milberg Weiss firm within sixty days of the date the *Burke* complaint was filed, rather than sixty days from the filing of the *Massey* complaint. As such, the name and style of that case should also have been included.

assert differing sets of claims, there is hardly an attempt to divide the claims, so that an investor could faithfully evaluate his competence to act as lead plaintiff over some or all of those claims.  This raises the issue of what information must be contained within the notice of the filing of the class action for it to satisfy the requirement that members of the purported class be therein advised "of the claims asserted [in the action]."  15 U.S.C. § 78u-4(a)(3)(A)(i)(I).

In its explanation of the phrase "claims asserted therein" contained in section 21D(a)(3)(A)(i)(I), the district court in *Ravens v. Iftikar*, 174 F.R.D. at 654-55, stated:

"Claims asserted therein" might refer to the nature and character of the class action or, alternatively, it might simply require a recitation of the statutory basis for the suit. To decide which of these constructions Congress intended, the court must consider the legislative history of the Act and the interpretations which courts have given such language in analogous contexts.

The overriding goal of the Reform Act is to displace figurehead plaintiffs with real investors in securities class actions. See Senate Rep. No. 104- 98, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 679, 685. To do this, Congress replaced the antiquated practice of selecting representative plaintiffs by "the race to the courthouse" with a more rational selection system. *See id.* at 689. Under the new system, it is expected that the most adequate representative of the class will emerge from a competition among all qualified investors. To ensure that all such investors make an informed decision whether to throw their hats into the ring, Congress implemented the notice requirements of sections 27 [of the Securities Act of 1933] and 21D.

The notice provisions are only effective, however, if qualified investors are notified of the nature and character, not just the existence, of the claims asserted. An investor can only make an informed determination whether intervention appropriate to protect his interests if he is provided information describing the legal and factual basis of the claims. A mere recitation of the statute, or statutes, under which the claim is brought is simply inadequate to give an investor the information necessary to make the decision to intervene or not.

An appropriate analog for what the Reform Act requires is the notice that has historically been required under Rule 23 of the Federal Rules of Civil Procedure. Rule 23(c)(2) mandates that, prior to class certification, the named

plaintiff must provide potential class members with "the best notice practicable under the circumstances." The basic purpose of this notice requirement is to "present a fair recital of the subject matter of the suit and to inform all class members of their opportunity to be heard." *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977). In furtherance of this goal, the Fifth Circuit set forth the following standard for Rule 23(c)(2) notice:

> Not only must the substantive claims be adequately described but the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action. The standard then is that the notice required by subdivision (c)(2) must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.

*In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1104-05 (5th Cir. 1977); see also *In re Domestic Air Transportation Antitrust Litigation*, 141 F.R.D. 534, 553 (N.D. Ga. 1992) ("Notice must not only reach the affected parties, but it must also convey its message in a meaningful way."). A qualified investor considering whether to challenge the named plaintiffs for lead plaintiff designation will need at least this much information to make a rational decision whether to commit the resources necessary to represent the class.

The Court finds the reasoning of the *Iftikar* court persuasive. See also *In re Network Associates, Inc., Securities Litigation*, 76 F. Supp. 2d at 1024 n3 (stating the same). As previously concluded, notice must provide to an investor sufficient information from which that investor could make a reasonable determination whether he, she, or it could adequately represent the class with respect to any or all of the claims in the action. The mere recitation of the statutory grounds for relief, with the somewhat redundant assertion that the action involves securities fraud, fails to provide enough information to fulfill this aim. While this error easily could have been avoided by an explanation of the "alleged wrongdoing that forms the basis of the complaint" and the points in time at which each

of the acts of wrongdoing occurred, no such attempt was made here. See *Iftikar*, 174 F.R.D. at 655.[44]

"The true character of the [notices] as puff pieces for the plaintiff law firms is evident from the extensive portions that they devote to aggrandizing the lawyers' capabilities." *Id.* at 659. Inherently, there is nothing improper about a law firm hawking its wares in a notice published pursuant to section 21D(a)(3)(A). In a properly drafted notice, such advertisement provides potential lead plaintiffs a genuine option in requesting appointment of lead counsel. It also informs interest investors of a viable source of information about the case. However, the uninformative and misleading notices published in the present action essentially required interested class members to contact the counsel named therein before taking any further action.

The Court need not go so far as to dismiss the class claims or lead plaintiff motions in the instant action because of the publication of defective notice. See *In re Network Associates Securities Litigation*, 76 F. Supp. 2d at 1032. Rather, the Court will, as set out herein, appoint a temporary lead plaintiff. After counsel is appointed for the lead plaintiff, the Court will require, contemporaneous with the filing of an amended complaint, the filing of a proposed section 21D(a)(3)(A) notice. This notice shall follow the requirements of notice set forth in this opinion; where appointed counsel has a question about the amount of information to include in such notice, it is advised to err on the side of greater inclusion of information. After review (and, perhaps, alteration) by this Court, such notice will be published by counsel in accordance with section 21D(a)(3)(A)(i). From the responses, if any, to the republished notice, the Court will determine whether any member of the temporary lead plaintiff committee need be

---

[44] The notice of the *Burke* plaintiffs is similarly flawed, in that the time periods in which the alleged wrongs occurred is not included, denying interested investors of the ability to determine the degree to which they have claims in common with other putative class members.

substituted or whether the temporary lead plaintiff may continue to serve as permanent lead plaintiff, without alteration.

## Lead plaintiff certification.

Subsection 21D(a)(2)(A) of the Exchange Act requires that an institution or individual who desires to serve in a representative capacity in a securities class action provide to the district court certification that certain facts about he, she, or it are true and that certain requirements have been met, as enumerated in the subsection. This subsection states:

(A) In general
Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that--

(i) states that the plaintiff has reviewed the complaint and authorized its filing;

(ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;

(iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

(iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;

(v) identifies any other action under this chapter, filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and

(vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

15 U.S.C. § 78u-4(a)(2)(A). The certification requirement is applicable not only to those who file complaints, but to those who move to be appointed lead plaintiff.[45] See *Chill v.*

---

[45] The district courts have disagreed on this issue, some taking the language of subsection 21D(a)(2)(A) requiring that certification be "filed with the complaint" by "[e]ach plaintiff seeking to serve as a representative party" as exclusive, not requiring individuals filing a motion to be appointed lead plaintiff, as opposed to a complaint, to include a certification pursuant to section 21D(a)(2)(A). *See Aronson v. McKesson HBOC*, Inc., 79 F. Supp. 2d 1146, 1155 (N.D. Cal. 1999) and *Greebel v. FTP Software, Inc.*, 939 F. Supp. at 61. However, the Court is persuaded by the reasoning of the district court in *Chill v. Green Tree Financial Corp.*, 181 F.R.D. at 410:

> With due respect [to district courts concluding otherwise], we disagree, and conclude that Congress intended the provision of certifications in conjunction with a Lead Plaintiff Motion. As pertinent, the legislative history of the [Reform Act] reveals that Congress intended all prospective Lead Plaintiffs to provide the information contained in the certifications:
>
>> The Committee recognizes that certain basic information about the lead plaintiff should be provided at the outset of litigation. Accordingly, the Committee requires that the lead plaintiff file a sworn certified statement with the complaint. The plaintiff must certify that he or she: (a) reviewed and authorized the filing of the complaint; (b) did not purchase the securities at the direction of counsel or to participate in a lawsuit; Copr. is willing to serve on behalf of the class. To further deter professional plaintiffs, the plaintiff must also identify any transactions in the securities covered by the class period, and the other lawsuits in which the plaintiff has sought to serve as lead plaintiff in the last three years.
>
> Senate Report No. 104-98, at 689.
>
> It would be anomalous, if not perverse, to require sworn certifications from only the plaintiffs named in a complaint, but then allow others persons to be appointed as Lead Plaintiffs, without attesting to any of the information adjudged appropriate to that standing, by Congress.
>
> In the absence of such certifications, the entire scheme of the [Reform Act] could be displaced, as inventive law firms would still be allowed to recruit "professional plaintiffs," and foist them on an unsuspecting, and uninformed Court, in the context of a Lead Plaintiff Motion. If Congress intended "that certain basic information about the lead plaintiff should be provided at the outset of litigation," in order to "mak[e] it harder for lawyers to invent a suit and then attach a plaintiff," we will not read the requirement, that the certification be filed with the Complaint, as preemptive, so as to preclude the supervising Court from requiring that the same information be provided in conjunction with a Lead Plaintiff Motion. If there is any benefit in appending a certification to the

*Green Tree Financial Corp.*, 181 F.R.D. 398, 410 (D. Minn.1998). Only those plaintiffs who satisfy the certification requirement of the subsection can serve as lead plaintiff. See *In re Network Associates, Inc., Securities Litigation*, 76 F. Supp. 2d at 1047 (reproducing Memorandum of the Securities and Exchange Commission in which it is stated that "the Reform Act essentially bars from the lead plaintiff role a person who has been lead plaintiff in more than five securities class actions in three years (unless the court otherwise permits); a person who does not read the complaint before a lawsuit is filed in his or her name; a person who buys the stock at the direction of an attorney or to participate in litigation; or, most notably, a person who receives a bounty payment for serving as a class representative."). As such, the certification requirement forms the baseline for any party seeking to act as lead plaintiff in a securities class action.

Examination of subsection 21D(a)(2)(A), viewed in the light of the legislative history and the expressed purpose of the Reform Act, shows that certification serves three purposes: First, it insures that individuals or institutions requesting to serve as representative plaintiffs are not "professional plaintiffs," disfavored by Congress plaintiffs seeking to serve in a representative capacity are effectively required to state that they are not professional litigants. See 15 U.S.C. §§ 78u-4(a)(2)(A)(ii), (v) & (vi) and *D'Hondt v.*

---

Complaint, it is only realized when the Court reviews the certification in the context of a Lead Plaintiff Motion. To limit the certification requirement would not only hamstring the effectiveness of the supervising Court, but would trivialize Congress' expressed concern for investing the control over Federal securities class actions in the hands of qualified litigants, as opposed to their lawyers. Even if we err in our reading of the [Reform Act], we conclude that, inherently, we have the authority to require the certifications, which the Maguire Group voluntarily filed, in order to assure the proper administration of the Act, and the integrity of the Court processes. Accordingly, were we to have concluded that such certifications were not required under the Act, we would have directed that such certifications be submitted as an integral part of Lead Plaintiff Motion.

Neither lead plaintiff contender raises the certification issue, although it would necessarily be an issue were the certifications filed in the instant action improperly made.

*Digi International, Inc.*, 1997 WL 405668 at *2 (D. Minn. 1997). Second, certification, if properly obtained, guarantees that the plaintiff put forward as a class representative authentically seeks to oversee the litigation and represent the class. For this reason, subsections 21D(a)(2)(A)(i) & (iii) require each class member filing a certification to state that he, she, or it "has reviewed the complaint and authorized its filing" and "is willing to serve as a representative party on behalf of a class. . . ." 15 U.S.C. §§ 78u-4(a)(2)(A)(i) & (iii). Finally, certification requires a plaintiff seeking to serve in a representative capacity to put forward with his, her, or its motion such information from which the district court can evaluate the adequacy of that plaintiff against competitors under subsection 21D(a)(3)(B)(iii)(I). See 15 U.S.C. § 21D(a)(2)(A)(iv).

Certifications ostensibly comporting with the requirements of subsection 21D(a)(2)(A) have been filed by all movants seeking to be appointed lead plaintiff in the present action. In addition, such certifications have been filed by other movants not seeking to serve as lead plaintiff, but apparently desiring that SWIB be appointed lead counsel. While all certifications appear inviolate on their face, SWIB attacks the certifications attached to the motion by the Group to be appointed lead plaintiff not on the grounds that they fail to include some specific requirement of certification,[46] but on

---

[46] SWIB comes close to making the argument that each certification of a proposed member of the Group does not comport with subsection 21D(a)(2)(A)(iii) because each "states only that the person listed is willing to serve as a representative party. . . ." Supplemental Memorandum in Support of State of Wisconsin Investment Board's Motion for Appointment as Lead Plaintiff and Response to Milberg Weiss Group's March 3 Submission at 21. However, under the statute, no purported member of the Group was required to do more. See 15 U.S.C. § 78u-4(a)(2)(A)(iii) (stating that plaintiff must certify that "the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary"). Further, this "defect" only occurs in a certain few of the certifications; most contain an assertion that the signatory plaintiff is "willing to serve as lead plaintiff. . . ."

The Court also notes, with favor, the following statement of the district court in *D'Hondt v. Digi International, Inc*, 1997 WL 405668 at *2:

Each of the persons, who now seek appointment as a Lead Plaintiff, has filed the requisite certification, but the Defendants urge that the Movants "cookie

the grounds that many of those filing the certifications were unaware that in doing so, they were certifying to a willingness to act as lead plaintiff in the action. Rather, asserts SWIB, these persons were under the impression that they were required to file such certifications in order to obtain a portion of any class relief awarded. SWIB makes this charge on the grounds that an individual, Douglas Gilbert ("Gilbert"), who provided a certification to the Group, also provided a certification to counsel for SWIB in response to the notice published by the *Burke* plaintiffs. In an affidavit filed with the Court, Gilbert avers, first, that at no time did he authorize putative counsel for the Group to represent him; second, that he submitted the certification to preserve his rights in any claims that he might have against the Defendants; and, third, that he did not know either of his being put forward as member of a lead plaintiff group or that the Group of which he was purportedly a member was guided by a "steering committee" of twelve individuals.

The Group responds that Gilbert's affidavit was secured in a trolling exercise undertaken by counsel for SWIB through which it contacted the Group's clients and tried to persuade them to defect from the Group and support SWIB. In support of its allegation, the Group presents a signed declaration of Ryan Bowell ("Bowell"), in which Bowell states that although he never responded to the notice published by the *Burke* plaintiffs' counsel (presently serving as SWIB's counsel), he was contacted by SWIB counsel on March 9, 2000, and requested to defect from the Group and support SWIB's motion to be appointed lead plaintiff. The Group also presents, under seal, copies of retainer agreements between Milberg Weiss and both Gilbert and Bowell.

---

cutter" certificates merely parrot the preconditions of the Reform Act, and do not provide the Court with a genuine showing that they will properly fulfill their responsibilities as a Lead Plaintiff.

We recognize, as the Defendants have urged, that the Movants' certifications do no more than ministerially conform to the defined requirements of the Reform Act, but we are not impressed that either the Act, or our supervisory responsibility over class actions, demands more.

The issue before the Court is not so much whether certifications were filed, but whether alleged members of the Group have a genuine willingness to act as representative plaintiffs, a fact that the certification requirement is meant to determine.[47] If not, a central purpose of the certification requirement goes unserved and the motion to be appointed lead plaintiff filed by the Group is, at least in part, belied by the unwillingness of certain of its members to serve in such capacity.

The Court sees the assertions of Gilbert and Boswell as stemming both from the faulty published notices and from overreaching attempts by counsel for both SWIB and the Group to collect certifications in their respective attempts at obtaining lead plaintiff status.  The purpose of the certification requirement is to put before a court for consideration those individuals or institutions both willing and able to act as lead plaintiff in the action; it is not to hold a petition drive. The Court houses deep reservations about appointing any body to act in a lead plaintiff capacity where there exist serious questions whether all of the purported members of that body are aware that they are to act as lead plaintiff or that they are spoken for by a "steering committee" chosen by counsel and unanswerable to the members of the supposed body.  However, the Court is of the opinion that such problems cease to be genuine is appropriate strictures are placed on the formation of plaintiffs' groups.  It is these strictures that the Court will next develop.  As to the Court's concerns about the recruitment efforts of counsel for SWIB, the Court

---

[47]  There obviously exists the question as to whether all of the certifications filed by the Group were valid, given the assertions by Gilbert that he was unaware of its use as part of the Group's attempts to be appointed lead plaintiff.  However, this question is secondary to whether the individuals filing certifications knew that those certifications were being used to bolster the Group's attempts at being appointed lead plaintiff.  Nonetheless, the question of whether the Group filed certifications fulfilling the formal prerequisites of subsection 21D(a)(2)(A) is to be answered in the affirmative.

believes these are properly considered as reasons to object to the appointment of SWIB's present counsel as lead counsel, a matter not addressed herein.[48]

### Can the Group serve as lead plaintiff?

As the Court has earlier noted, the Group has defined itself in two ways: first, as a combination of the twelve individuals who lost approximately $ 2.6 million in the purchase of Just for Feet common stock and, second, as an agglomeration of the nearly three-hundred individuals who lost approximately $ 6.5 million in transactions in Feet stock and who are led by the twelve-person steering committee. SWIB challenges the Group's qualifications to serve as lead plaintiff because the Group is not a "person or group of persons" as required in subsection 21D(a)(3)(B)(iii)(I) of the Exchange Act. The crux of SWIB's argument is that the Group is not a "group" under the subsection, as the members of the Group share no common interest as an entity beyond their shared losses resulting from the purchase of Just for Feet common stock. The Group responds that it is a sufficiently cohesive entity to serve as lead plaintiff and that the statute does not prohibit a "group" that simply aggregates its losses from serving as lead plaintiff.

The idea that a number of plaintiffs might aggregate themselves and their losses into a group for the purpose of demonstrating the largest financial interest and adequacy to serve as lead plaintiff derives from language in subsection 21D(a)(3)(B)(iii)(I) stating that "the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this Act is the person or *group of persons*" who best meet certain criteria listed therein.[49] 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (emphasis added). However, the response

---

[48] This also applies to the issue of a conflict of interests between the representation by the proposed for counsel  the Group in this case and its present representation of the class in the *Drucker* case before Judge Blackburn.

[49] What these criteria are and how they operate is explained, *infra*, in the Court's discussion of the adequacy prerequisities.

of district courts to the suggestion that combinations of unrelated individuals and investors can be aggregated into lead plaintiff groups under this section has ranged from tepid acceptance to open hostility. Essentially, as stated by one commentator, "Courts have interpreted the [Reform Act's] aggregation language in three ways: (1) permitting any number of plaintiffs to aggregate, (2) aggregating only a limited number of individuals or institutions, or (3) refusing to permit aggregation." Heck, *Conflict and Aggregation*, 66 U. Chi. L. Rev. at 1214. The Court will first examine each of these interpretive "traditions" in evaluating whether the aggregation of plaintiffs into a group is appropriate under section 21D(a)(3)(B)(iii) in light of the Reform Act's language, structure, and purposes.

**Permissive aggregation.**

Absolute, permissive aggregation has had few active proponents; in the majority of cases in which large plaintiffs' groups were permitted to have charge of the litigation, the aggregation problem went unaddressed.[50] The first court to affirmatively permit aggregation was the court in *D'Hondt v. Digi International, Inc.*, 1997 WL 405668. In that action, the court was confronted with a motion to appoint as lead plaintiff a group of

---

[50] The Court notes the existence of other actions, such as *Lax.v First Merchants Acceptance Corporation*, 1997 WL 461036 (N.D. Ill. 1997), *Nager v. Websecure, Inc.*, 1997 WL 773717 (D. Mass. 1997), *In re Olsten Corp. Securities Litigation*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998), *Squyres v. Union Texas Petroleum Holdings, Inc.*, 1998 WL 1144586 (C.D. Cal. 1998), *Knisley v. Network Associates, Inc.*, 77 F. Supp. 2d 1111 (N.D. Cal. 1999), in which plaintiffs' groups were appointed lead plaintiff with little consideration by the district court whether plaintiffs' groups can appropriately serve as lead plaintiffs.

An odd case among these is *In re Oxford Health Plans, Inc. Securities Litigation*, 182 F.R.D. 42, 46 (S.D.N.Y. 1998), in which the district court appointed a plaintiffs' group as a co-lead plaintiff with two other institutional investors, each having an equal vote in the conduct of the litigation, concluding that in so doing it would lessen future problems related to resources to pursue the litigation and ameliorate potential class conflicts. The district court did not discuss the potential problems inherent in appointing a plaintiffs' group as one of those co-lead plaintiffs.

twenty-one plaintiffs objected to by the defendants in the action. The district court determined that aggregation was permissible and that the plaintiffs' group could serve as lead plaintiff; however, it drew that conclusion hesitantly:

> [T]he Defendants express concern that the expansive number of Lead Plaintiffs, which the Movants propose, predisposes the putative class to the control of Lead Counsel — a prospect which directly contravenes the Congressional purposes behind the Reform Act. In addition, the Defendants underscore that, by merely mimicking the requisites of the Reform Act, the Movants' certifications fail to adequately inform the Court as to their individualized qualifications to serve as Lead Plaintiffs. Indeed, the Defendants make much of the concession of Plaintiffs' counsel that, should the Court believe that the number of proposed Lead Plaintiffs is excessive, then a lesser number of Lead Plaintiffs can be proposed for selection. In the Defendants' view, this concession abundantly demonstrates that counsel for the putative class continue to control the actions of the class members in ways that the Reform Act attempted to halt.
>
> * * *
>
> While the assertion can legitimately be made that the larger the number of proposed Lead Plaintiffs, the greater the dilution of the control that those Plaintiffs can maintain over the conduct of the putative class action, an equally cogent assertion can be broached that, when more greatly numbered, the Lead Plaintiffs can more effectively withstand any supposed effort by the class counsel to seize control of the class claims. In our view, when, as here, the putative class may total in the hundreds of thousands, if not millions, an arbitrary limit on the number of proposed Lead Plaintiffs would be unrealistic, if not wholly counterproductive. Counsel for the Plaintiffs have canvassed those putative class members, who have expressed an interest to appear as Lead Plaintiffs, using criteria of selection which are facially valid, and we are not convinced that, in promulgating the remedies of the Reform Act, Congress intended a substantial departure from the ordinary application of the attorney- client relationship. . . .

*Id.* at *3. The court then remarked on its power to oversee counsel's conduct in the action as a grounds for not investigating the composition of the plaintiffs' group.

> [I]n declining the Defendants invitation to invasively investigate the Lead Plaintiffs, we do not abdicate our proper role in the supervision of class actions. First, if we had any doubts as to the capacity of a Lead Plaintiff to fairly and

adequately represent the class, or if we perceived that the interests of a Lead Plaintiff were subject to a unique defense, then we would have no hesitation in focusing the requisite inquiry that the putative class members should be conducting and, should they default, in undertaking the Court's own investigation. No such showings have been made here, however. More importantly, in relying upon the investigative efforts of the putative class members, we do not yield our responsibility to properly supervise the conduct of class actions. Should irregularities occur in the class members' nomination of Lead Plaintiffs, they are subject to the Defendants' discovery in preparation for any Motion for Class Certification, and the Court's obligation to conduct a mandatory review of any proposed settlement of the case, inclusive of attorneys' fee requests, and to review, and to make specific findings concerning the parties' compliance with Rule 11(b), Federal Rules of Civil Procedure. See, *Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 60 (D.Mass.1996) (Court concludes that its determination to appoint a person or persons as Lead Plaintiff "must be without prejudice to the possibility of revisiting that issue in considering a motion for class certification."); Title 15 U.S.C. § 78u-4(a)(7) and (c).

*Id.* at *4.(Footnotes omitted).  Soon thereafter, in *Gluck v. CellStar Corp.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997), a case involving both SWIB and the Group's counsel and arising in the Northern District of Texas, the district court, while denying the plaintiffs' group lead plaintiff status, nonetheless stated, without qualification, that "aggregating the shares of several plaintiffs for purposes of [the largest financial interest] calculation is proper under the statutory language. . . ."

In *Reiger v. Altris Software, Inc.*, 1998 U.S. Dist. LEXIS 14705 at *13 (S.D. Cal. 1998), the district court was confronted with competing plaintiffs' groups seeking to serve as lead plaintiff. One of the groups, while having the least loss in the aggregate, contained an institutional investor who had, individually, sustained the greatest alleged financial loss. The other aggregate group contained no institutional investors but suffered, in the aggregate, the greater loss between the groups. The district court chose as lead plaintiff the group with the greater aggregate loss. Coming to its conclusion, the district court asserted reliance on the express meaning of the subsection: "By using the phrase 'group

of persons,' Congress made clear that a court can consider the aggregate group's losses in determining which group has the largest financial interest." *Id.* Further, the district court rejected the argument that one group was to be preferred over another because of the presence of an institutional investor:

> The statutory presumption applies to "the person or group of persons" with the greatest financial interest in the relief sought. While legislative history mentions the goal of increasing the involvement of institutional investors in securities litigation, there is no express provision in the Act limiting the rebuttable presumption to investors. It is well settled that the plain language of the Act is controlling.

*Id.* at 13-14.

### Limited aggregation.

The limited aggregation approach shares with the permissive aggregation approach the position that an unrelated group of persons can aggregate into a plaintiffs' group to serve as lead plaintiff. However, citing the control problems likely to ensue from fully permissive aggregation, courts taking the limited aggregation approach circumscribe the number of investors who can serve in such a capacity through the employment of a "rule of reason." This position received its first articulation in *Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398. In *Chill*, the court that authored the *D'Hondt* opinion revisited its reasoning regarding appointment of lead plaintiff. The plaintiffs' group proposed in *Chill*, the Maguire Group, presented to the court a two-tiered structure under which it sought to serve as lead plaintiff. The first tier of group in *Chill* consisted of nearly three hundred individuals, governed by the second tier, a group of only seven. The court concluded that the appointment of a plaintiffs' group approaching three hundred individuals and investors "would threaten the interests of the class, would subvert the intent of Congress, and would be too unwieldy to allow for the just, speedy and inexpensive determination of this action," even if, in some sense they were "governed" by

the group of seven. *Id.* at 408. In coming to this conclusion, the court referred to the Congressional history and to its earlier opinion in *D'Hondt.*

> If, as we understand its intent, the [Reform Act] was enacted to transfer "primary control of private securities litigation from lawyers to investors," Senate Rep. No. 104-98, at 685, then the Lead Plaintiff procedure should focus on the selection of a select committee to manage and direct the litigation, as opposed to management through a Committee of the Whole. "The lead plaintiff should actively represent the class." *Id.* at 689. In an effort to delimit the number of Lead Plaintiffs, the Maguire Group proposes that only seven of the suggested three hundred would have an active role in the litigation with, apparently, the remaining members serving some less active role. Whether the Maguire Group intends, as they have represented, to offer the bulk of its members no meaningful active role in the litigation, or to allow each of them to serve, in practice, as a Lead Plaintiff, we are faced with a prospect — that of an over — or a potentially under represented grouping of Lead Plaintiffs — which is inconsistent with the intent of Congress.

> \* \* \*

> As we have previously stated, "the assertion can legitimately be made that the larger the number of proposed Lead Plaintiffs, the greater the dilution of the control that those Plaintiffs can maintain over the conduct of the putative class action, [while] an equal cogent assertion can be broached that, when more greatly numbered, the Lead Plaintiffs can more effectively withstand any supposed effort by the class counsel to seize control of the class claims." *D'Hondt v. Digi Int'l Inc.,* 1997 WL 405668 \*3 (D.Minn.1997). *We do not suggest that either Rule 23, or the [Reform Act], warrants an arbitrary limit on the number of proposed Lead Plaintiffs, for we only hold that, in a case-by-case inquiry, a rule of reason prevails. If the proposed group of Lead Plaintiffs will not "actively represent the class," and the profusion of Lead Plaintiffs would threaten to unnecessarily complicate the proceedings, then the Court may exercise its supervisory authority to restrict the number of Lead Plaintiffs.* Such a restriction is warranted here. Therefore, we reject the Maguire Group's proposition that, as currently constituted, it is the most capable of adequately representing the class.

*Id.* at 408-09 (emphasis added).

The Court then examined the certifications of the Maguire Group and picked six of the members of that group to serve as lead plaintiffs. In arriving at this result, the court reasoned that the defect of overabundance was a fault of the group as an entity and did not count as a strike against the six individuals chosen to potentially act a lead plaintiffs. *Id.* at 409.

The district court in *In re Advanced Tissue Sciences Securities Litigation*, 184 F.R.D. 346, 352 (S.D. Cal. 1998), followed the lead of the *Chill* court and reduced a group of approximately 250 plaintiffs to six. In so doing, the district court concluded:

> The idea of appointing over 250 unrelated, individual investors as lead plaintiffs runs afoul of Congress's intent in enacting the [Reform Act]. The very purpose of the [Reform Act] was to curtail the influence of professional, figurehead plaintiffs by transferring "primary control of private securities litigation from lawyers to investors." S.Rep. No. 104-98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683, 685. Although the [Reform Act] expressly contemplates the appointment of more than one lead plaintiff, see, e.g., 15 U.S.C. § 78u-4(a)(3)(B)(i) (stating that the court "should appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of the class members") (emphasis added), *the courts have repeatedly rejected motions for the appointment of large amalgamations of unrelated persons as lead plaintiffs as being directly contrary to the [Reform Act]*, see, e.g., *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398 (D.Minn.1998) (rejecting the appointment of a group of over 300 investors as lead plaintiff as subverting the intent of Congress and as being "too unwieldy to allow for the just, speedy and inexpensive determination of this action"). Instead, courts that have aggregated financial losses for the purpose of designating the lead plaintiff have tended to confine their appointments of lead plaintiff to small groups of individuals. In deciding how many lead plaintiffs to appoint in a given case, the courts have applied a "case-by-case inquiry" and "a rule of reason" approach. *Id.* at 409. *Where the courts have found that a proposed group of lead plaintiffs is too large to actively represent the interests of the purported class, the courts have exercised their supervisory authority to restrict the number of lead plaintiffs. Id.*

*Id* (internal footnotes omitted and emphasis added).

*In re Milestone Scientific Securities Litigation*, 183 F.R.D. at 417, involved a group of seven investors who sought to be appointed lead plaintiff. The district court found no difficulty in appointing a group of plaintiffs of the limited size proposed, explaining that:

> The fact that a group, as opposed to a single individual, is proposed as lead plaintiff does not necessarily render [that group] inadequate. The [Reform Act] expressly provides a "group of plaintiffs" may be deemed most adequate plaintiffs. See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). It has also been held that the appointment of more than one lead plaintiff does not violate the [Reform Act]. See *Oxford*, 182 F.R.D. at 46-47; *In re Cephalon Secs. Litig.*, 1996 WL 515203, at *1 (E.D.Pa. Aug. 27, 1996).
>
> While the [Reform Act] does not limit the number of proposed lead plaintiffs, a "rule of reason prevails." See Chill, 181 F.R.D. at 409.
>
>> The assertion can legitimately be made that the larger the number of proposed Lead Plaintiffs, the greater the dilution of the control that those Plaintiffs can maintain over the conduct of the putative class action ....
>
> *D'Hondt*, 1997 WL 405668, at *3. *The inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in weakened bargaining power of the lead plaintiffs. In particular, multiple lead plaintiffs may be hampered in their collective ability to effectively negotiate retention agreements and supervise the conduct of counsel.* See *Cendant*, 182 F.R.D. at 147 ("[R]epresentation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation."). In this regard, the appointment of multiple lead plaintiffs may
>
>> detract from the [Reform Act's] fundamental goal of client control, as it would inevitably delegate more control and responsibility to the lawyers for the class and make the class representative more reliant on the lawyers.
>
> *Gluck*, 976 F.Supp. at 549-50; see *Steiner v. Frankino*, No. 1:98 CV 0264, slip op. at 12 (N.D. Ohio July 16, 1998); *Donnkenny*, 171 F.R.D. at 157-58.

*Id.* at 417 (emphasis added). The district court then took issue with the suggestion that a group consisting of a variety or diversity of investors would best serve in a lead plaintiff capacity, noting the problem of faction likely to result from permitting full-fledged diversity to be deemed a benefit to representation of a class.

One court, in appointing co-lead plaintiffs, reasoned that multiple lead plaintiffs allows for "diverse representation." See *Oxford*, 182 F.R.D. at 49. Diverse representation is, however, an insufficient rationale justifying the appointment of multiple lead plaintiffs. See *Cendant*, 182 F.R.D. at 148 (rejecting [on a motion to appoint lead plaintiff filed in a Securities Act action] "the argument that additional plaintiffs bring to the litigation other counsel capable of advancing additional funds" as a basis for appointing multiple lead plaintiffs). *Focusing on considerations such as diverse representation and additional financing overlooks the fundamental goal of the [Reform Act], that of empowering a unified force to control the litigation.* See Conference Report at 683, 685; *Gluck*, 976 F.Supp. at 549-50.

Where multiple lead plaintiffs have divergent interests, the leadership of a class may be divided, and rendered factious. While the [Reform Act] refers to "a person or group of persons" as capable of serving as the lead plaintiff, *the surrounding statutory language forecloses the appointment of multiple groups or multiple persons not part of a cohesive group. Significantly, apart from the sole reference to a "group of persons," the [Reform Act] is worded in the singular, providing a mechanism for the appointment of "the most adequate plaintiff," not the most adequate plaintiffs.* See 15 U.S.C. § 78u-4(a)(3)(B)(i) and (iii).

*Id.* at 417-18 (emphasis added).

In *In re Baan Co. Securities Litigation*, 186 F.R.D. 214 (D.D.C. 1999), the district court was confronted with an unopposed motion to appoint as lead plaintiff a group of 466 investors led by a twenty-member subgroup. In addressing the motion, the district court first noted that "Congress envisioned that courts still would play an independent, gatekeeping role to implement the [Reform Act]." *Id.* at 215. The district court then discussed the differing approaches to the aggregation issue. It first disagreed with the blanket position that unrelated groups of individuals could not serve as lead plaintiff in a securities action.

While Congress provided flexibility for a "group of persons" to be lead plaintiff, "[t]he most important open question under the lead plaintiff section of the [Reform Act] is whether unrelated individuals or institutions may aggregate their shares in order to be deemed the 'most adequate plaintiffs'. . . ." John C. Coffee, Jr., *Developments Under the Private Securities Litigation Reform Act of 1995:*

> *The Impact After Two Years*, SC53 ALI-ABA 395, 423 (1997) []. One court has
> suggested that unrelated individuals cannot be a "group of persons" under the
> [Reform Act]. See, e.g., *In re Donnkenny Inc. Secs. Litig.*, 171 F.R.D. 156, 157- 58
> (S.D.N.Y. 1997). This Court believes that suggestion goes too far. The text of the
> [Reform Act] does not limit the composition of a "group of persons" to those only
> with a pre-litigation relationship, nor does the legislative history provide a sound
> enough foundation to support such a gloss.

*Id.* at 216.  The *Baan* court then discussed whether an unlimited number of investors
could act in the aggregate as a group, or whether there existed a limit to the number of
such individuals that could serve in a plaintiffs' group.

> Courts trying to implement Congress's intention that clients rather than
> lawyers control the litigation have divided when considering how to treat a Lead
> Plaintiff motion by a large group of unrelated investors. On one view:
>
>> While the assertion can be made that the larger the number of
>> proposed Lead Plaintiffs, the greater the dilution of control that
>> those Plaintiffs can maintain over the conduct of the putative class
>> action, an equally cogent assertion can be broached that, when
>> more greatly numbered, the Lead Plaintiffs can more effectively
>> withstand any supposed effort by the class counsel to seize control
>> of the class claims.
>
> *D'Hondt v. Digi Int'l, Inc.*, 1997 WL 405668 *3 (D.Minn. Apr. 3, 1997). On a
> related note, another court found that "diverse representation" of the plaintiff class
> was a value to be preserved in choosing a Lead Plaintiff. See *In re Oxford Health
> Plans, Inc. Secs. Litig.*, 182 F.R.D. 42, 49 (S.D.N.Y.1998) (appointing unrelated
> individuals and two institutions as co- Lead Plaintiffs).
>
> On the other side, courts have determined that multiple lead plaintiffs will
> be unable to control the litigation, effectively negotiate retention agreements, and
> supervise the conduct of counsel. See, e.g., *In re Advanced Tissue Sciences Secs.
> Litig.*, 184 F.R.D. 346 (S.D.Cal.1998) ("The idea of appointing over 250 unrelated
> individual investors as lead plaintiffs runs afoul of Congress's intent in enacting the
> [Reform Act]"); *In re Milestone Scientific Secs. Litig.*, 183 F.R.D. 404, 417
> (D.N.J.1998). When determining how many plaintiffs is too many, courts thus far
> have opted for a "rule of reason" approach. E.g., *Advanced Tissue*, 184 F.R.D. at
> 351-53 (winnowing proposed group of 250 to six).

For its part, the SEC also does not suggest an interpretation of "group of persons" that would erect a per se bar against aggregating previously unrelated investors. However, in its view:

> Construing the term 'group of persons' in light of the language and purposes of the Act, a court generally should only approve a group that is small enough to be capable of effectively managing the litigation and the lawyers. The Commission believes that ordinarily this should be no more than three to five persons, a number that will facilitate joint decisionmaking and also help to assure that each group member has a sufficiently large stake in the litigation.

SEC Mem. at 16-17.

*Id.* at 216-17. The court concurred in the approach of the SEC. A plaintiffs' group of 466 investors, the court concluded, was simply too large. Noting that several courts, in appointing lead plaintiff, had trimmed plaintiffs' groups down to more manageable numbers, it observed that, as "a small committee will generally be far more forceful, effective and efficient than a larger aggregation," the determination of lead plaintiff "should be made under a rule of reason but in most cases three should be the initial target, with five or six as the upper limit." *Id.* at 217.[51] Concluding that even the restricted group of twenty plaintiffs would be incapable of managing the litigation, the district court denied the motion to appoint lead counsel.

In *Yousefi v. Lockheed Martin Corp.*, 70 F. Supp. 2d 1061 (C.D. Cal. 1999), a group consisting of 137 plaintiffs filed an unopposed motion to be appointed lead plaintiff. The district court, after reviewing the case law, concluded that "the Act clearly contemplates the appointment of multiple plaintiffs to manage the litigation." *Id.* at 1068. However,

---

[51] The *Baan* court also made the acute observation that the differing views of the district courts on the issue are a reflection of those courts' "speculat[ions] as to how a group of investor-plaintiffs and their counsel are likely to interact." *Id.* at 217 n.3. Such speculation, the court observed, could be remedied by "social science data on how groups of lead plaintiffs, varying in size and with varying stakes in the litigation, interact with counsel regarding proposed settlements and other important strategic decisions." *Id.*

the court concluded, referring to the body of courts considering the issue that had refused to appoint plaintiffs' groups composed of a large number of plaintiffs, that it could not grant the unopposed motion, as permitting a group of the purported size to serve as lead plaintiff would run contrary to the purposes of the Reform Act. *Id.*

Given that it had denied the motion for lead plaintiff, the court then considered whether it had the authority to choose plaintiffs from among the members of the proposed group to serve as lead plaintiff. Concluding that it did, *id.* at 1070, the district court then chose two members of the plaintiffs' group and appointed them to act, together, as lead plaintiff, noting that "with the appointment of one lead plaintiff who is an individual private investor and one lead plaintiff that is an institutional investor, the lead plaintiffs will represent a broader range of shareholder interests than if the Court appointed an individual or an institutional investor alone." *Id* (citing *In re Oxford Health Plans*, 182 F.R.D. at 47).

*Takeda v. Turbodyne Technologies, Inc.*, 67 F. Supp. 2d 1129 (C.D. Cal. 1999), involved two motions by competing plaintiffs' groups to serve as lead plaintiff. Each group contained hundreds of individuals, but each had put forward a smaller subgroup to serve as lead plaintiff in case the district court determined that the larger groups were too large. Reciting the pertinent cases and noting that several courts had "frequently construed [the phrase "group of persons" contained in the Reform Act] to mean a small group of manageable size that is capable of joint decisionmaking regarding the litigation," the district court concluded that the larger groups were, in fact, too large, and appointed one of the offered subgroups as lead plaintiff. *Id.* at 1136.

In *In re Nice Systems Securities Litigation*, 188 F.R.D. 206, a group consisting of nine apparently unrelated plaintiffs filed an unopposed motion to serve as the lead plaintiff in the pending action. The court first observed that, in spite of the fact that the motion to appoint lead plaintiff went unopposed, under the Reform Act, it bore "an obligation to

review applications for the appointment of lead plaintiff and to appoint as lead plaintiff the member or members of the purported plaintiff class who are 'most capable of representing the interests of the class members.'" *Id.* at 221. It then attended to the issue of whether the size of the plaintiffs' group rendered the group incapable of being lead plaintiff. In concluding that nine individuals were too many to participate in a plaintiffs' group, the court stated:

> The fact that a group, as opposed to a single individual, is proposed as lead plaintiff does not necessarily render the Proposed Lead Plaintiffs inadequate. The [Reform Act] expressly provides a "group of plaintiffs" may be deemed most adequate plaintiffs. See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). It has also been held that the appointment of more than one lead plaintiff does not violate the [Reform Act]. See *Oxford*, 182 F.R.D. at 48-49; *In re Cephalon*, 1996 WL 515203 at *1 (E.D.Pa. Aug. 27, 1996).

*Id.* at 220. Stating that "[w]hile the [Reform Act] does not limit the number of proposed lead plaintiffs, a 'rule of reason prevails,'" *id* (citing *Chill*, 181 F.R.D. at 409), the district court determined that three of the nine individuals had losses so meager that they would likely have little reason to actively oversee the litigation. *Id.* at 221. Consequently, the district court reduced the number of members of the plaintiffs' group to six and appointed that group to serve as lead plaintiff. *Id.*

In *In re Party City Securities Litigation*, 189 F.R.D. 91, a proposed plaintiffs' group consisting of three members requested to be appointed lead plaintiff, without outside objection. Whereas one of the members of the proposed group had sold all of his shares of the stock of the defendant company, the other two plaintiffs retained shares in that company. In determining the lead plaintiff issue, the court considered whether it was appropriate to appoint all three group members lead plaintiff. First noting that the Reform Act does not rule out the appointment of multiple plaintiffs as lead plaintiff, the court reiterated that decisions to appoint multiple plaintiffs were guided by a rule of reason. *Id.* at 112. More than simply limiting the number of plaintiffs who could serve

as lead plaintiff, however, the district court found that the "rule of reason" also applied in determining the kinds of small-group configurations that could be appointed lead plaintiff. As the district court reasoned:

> One court, in appointing co-lead plaintiffs, reasoned that multiple lead plaintiffs allow for "diverse representation." See *Oxford*, 182 F.R.D. at 49. Diverse representation is, however, an insufficient rationale justifying the appointment of multiple lead plaintiffs. See *Cendant*, 182 F.R.D. at 148 (rejecting "the argument that additional plaintiffs bring to the litigation other counsel capable of advancing additional funds" as a basis for appointing multiple lead plaintiffs). *Focusing on considerations such as diverse representation and additional financing overlooks the fundamental goal of the [Reform Act] — the empowerment of a unified force to control the litigation.* See Conference Report at 683, 685; *Gluck*, 976 F.Supp. at 549-50.
>
> Where multiple lead plaintiffs have divergent interests, the leadership of a class may be divided, and rendered factious. *While the [Reform Act] refers to "a person or group of persons" as being capable of serving as the lead plaintiff, the surrounding statutory language forecloses the appointment of multiple groups or multiple persons not part of a cohesive group.* Significantly, apart from the sole reference to a "group of persons," the [Reform Act] is worded in the singular, providing a mechanism for the appointment of "the most adequate plaintiff," not the most adequate plaintiffs. See 15 U.S.C. § 78u- 4(a)(3)(B)(i) and (iii).

*Id.* at 113 (emphasis added). Thus, for the district court, the "rule of reason" not only prohibited large groups from acting as lead plaintiff, it also prevented smaller groups with conflicting and divergent interests from serving in at capacity either. *Id.* at 114. While the court noted that each of the plaintiffs had a substantial financial stake in the litigation, the interests of the plaintiffs who retained shares of the defendant's stock had a divergence of interest from the plaintiff who did not. *Id.*[52] As such, the district court severed the

---

[52]    In so concluding, the district court engaged in a thorough discussion of the "retention/seller conflict." *Id.* at 108. Briefly put, this conflict arises where some plaintiffs retain an interest in the defendant corporation (the retention plaintiffs) while others have divested themselves of all interest in the company (the in/out plaintiffs). As the district court explained:

> The Retention Plaintiffs, in effect, are suing themselves. They seek recovery for their individual losses while maintaining a financial interest in the continued

plaintiff who failed to retain any shares in the defendant company from the plaintiffs' group and appointed the remaining two plaintiffs to be lead plaintiff.[53]

### No aggregation of unrelated individuals.

The difference between those courts permitting limited aggregation and those opposed to aggregation is not whether more than one investor can serve in a lead plaintiff capacity. Both agree that certain small groups can serve in that capacity. Rather, the dispute centers on whether a small number of investors having no pre-existing affiliation, beyond their losses, can be aggregated to pursue lead plaintiff status as a group. While those in favor of limited aggregation assert that aggregation of a small group is permissible, within a rule of reason, those opposed to aggregation assert that there must be some pre-existing connection or confluence of interests among investors before they can combine to act as a group. The first of these cases staking out the anti-aggregation position, *In re Donnkenny Inc. Securities Litigation*, 171 F.R.D. 156, 158 (S.D.N.Y. 1997), involved a motion to appoint as lead plaintiff "two unrelated institutional investors and

---

> commercial viability and financial success of the defendant corporation. The In/out Plaintiffs, however, have no ongoing interest in either the continued commercial viability or financial success of the defendant corporation. The In/out Plaintiffs have one focus: maximizing their recovery from the defendant corporation.

*Id.* There is no such conflict in the instant suit, first, as this is an action against officers and directors of the company, not the company itself and second, stock of Feet is no longer being traded and Feet is seeking to discharge its entire debt on the shares.

[53] In *Mitchell v. Complete Management, Inc.*, 1999 WL 728678 at *4 (S.D.N.Y. 1999), the district court denied a motion by a group of 141 stock purchasers to be appointed lead plaintiff, stating that "such a large group of lead plaintiffs would prove unwieldy for making decisions about the litigation, thereby increasing the likelihood that attorneys would direct the action." However, it appeared, from the court's order, that it would permit appointment of a lesser group of plaintiffs, if supported by adequate justification. It is unclear, from the opinion, whether the district court had taken a limited aggregation or anti-aggregation stance.

four other individual class members." The district court refused to appoint the group of six investors and individuals to serve as lead plaintiff, stating:

> To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff. One of the principal legislative purposes of the [Reform Act] was to prevent lawyer-driven litigation. Appointing lead plaintiff on the basis of financial interest, rather than on a "first come, first serve" basis, was intended to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers. See H.R. Conf. Rep. No. 104-369, at 31-35 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 730, 730-34. To allow lawyers to designate unrelated plaintiffs as a "group" and aggregate their financial stakes would allow and encourage lawyers to direct the litigation. *Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff. Id.* at 35.

*Id* (emphasis added).

In *Tumolo v. Cymer, Inc.*, 1999 WL 1567741 (S.D. Cal. 1999), the district court denied an unopposed motion by a plaintiffs' group consisting of 339 members to be appointed lead plaintiff. The court found permitting aggregation of unrelated plaintiffs into groups was altogether inappropriate and concluded that the massive size of the group made appointment of it as lead plaintiff at odds with the "the legislative intent behind the [Reform Act]" and a likely threat to "the interests of the purported future class." *Id.* at *2. The court explained its reasoning as follows:

> One of the primary purposes of the lead plaintiff provisions of the [Reform Act] was to encourage a meaningful investor with a substantial stake in the litigation, preferably a large institutional investor, to initiate and control the litigation (and the lawyers who are behind it). See H.R. Rep. at 32 ("lead plaintiff mechanism is designed to increase the likelihood that parties with significant holdings in issuers . . . will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel."); *Ravens v. Iftikar*, 174 F.R.D. 651, 662 (N.D.Cal.1997). That is, Congress intended that the plaintiff with the "strongest financial interest will pursue the claims with the greatest vigor and will have both the interest and the clout to engage qualified counsel at the best rates for

the class." *In re Cendant Corp. Litig.*, 182 F.R.D. 144 (D.N.J.1998); S.Rep. No.
104-98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683, 685 ([Reform Act] seeks
to transfer primary control of private securities litigation from lawyers to
investors).

 While the court is certainly aware that the [Reform Act] expressly permits
the appointment of more than one lead plaintiff, courts have the discretion to
reject motions for the appointment of a large assortment of unrelated persons if
such an appointment would contravene the letter and spirit of the [Reform Act].
15 U.S.C. § 78u-4(a)(3)(B)(I) (a court "should appoint as lead plaintiff the member
or members of the purported plaintiff class that the court determines to be the
most capable of adequately representing the interests of the class members."); See
also, *Chill v. Green Tree Fin. Corp.*, No. 97-CV-2666, 1998 U.S. Dist. LEXIS 11427,
at *23 (D. Minn. June 29, 1998) (rejecting the appointment of a group of over 300
investors as lead plaintiff finding such a proposal "too unwieldy to allow for the
just, speedy and inexpensive determination of this action"). In fact, courts that
have aggregated financial losses of several plaintiffs for the purpose of designating
the lead plaintiff have tended to confine their appointments of lead plaintiff to
small groups of individuals. See *In re Donnkenny, Inc. Sec. Litig.*, 171 F.R.D. 156
(S.D.N.Y.1997); *Gluck v. Cellstar Corp.*, 976 F.Supp. 542, 549 (N.D.Tex.1997)
(appointment of large and diffuse group of investors detracts from the [Reform
Act's] goal of client control over the lawyers litigating the action).

*Id.* In addition, the district court refused to permit a smaller group of seven individuals
to act as lead plaintiff, finding that the smaller group had "failed to present sufficient
evidence that . . . [it was] . . . any more qualified to serve as lead plaintiff than any of the
other 332 proposed lead plaintiffs," reflecting concerns that permitting the unrelated
individuals to act as a plaintiffs' group would give counsel too much control over the
action. *Id.* at 3.

*Switzenbaum v. Orbital Sciences Corp.*, 187 F.R.D. 246 (E.D. Va. 1999), involved a
contest between a group of seven unrelated investors and a group of five related New
York City pension funds to serve as lead plaintiff. The district court concluded that the
group of pension funds, despite lower aggregate losses, would better act as lead plaintiff,
because, unlike the pension funds "little [was] known about the ties that the seven

members [had] to each other or to the putative class." *Id.* at 250. The district court noted as a further pertinent defect in the motion of the group of seven individuals, which also defined the group (at parts) as consisting of some 200 individuals, that it "is unable to agree on who its members are, some of its proposed members are ineligible to act as the Lead Plaintiff in any event, one formulation of the Group would include more people than could possibly manage the case, and the Group has never been forthcoming about any of these conflicts at all." *Id.* at 251.

*In re Telxon Corp. Securities Litigation*, 67 F. Supp. 2d 803, presents the strongest argument for disallowing the aggregation of unrelated plaintiffs into a plaintiffs' group for purposes of acting as lead plaintiff, in the wake of which, district courts have taken anti-aggregation approaches to the lead plaintiff problem with some consistency. In *Telxon*, the court considered three motions for appointment as lead plaintiff, one by a plaintiffs' group consisting of eighteen individuals (the "Alsin Group"), another by a plaintiffs' group consisting of three individuals — two brothers and an investment advisor — (the "Hayman Group") and, last, one by the Florida State Board of Administration ("FSBA"). *Id.* at 805. Each opposed the others' motions. A significant point of contention was whether the group consisting of eighteen individuals could serve as lead plaintiff under subsection 21D(a)(3)(B)(iii)(I). The court, drawing more from the statutory language and the overall scheme of the Reform Act thatn from its legislative history, concluded that the members of the Alsin Group could not aggregate into a plaintiffs' group. The court first surveyed the common meanings attributed to the term "group" to help determine its meaning within the confines of the statute.

> While the meaning of "group" urged by the Alsin Group finds some support in the dictionary, it would be an exaggeration to say that it is the "usual," "plain," or "ordinary" meaning ascribed to the word. Indeed, the majority of dictionary definitions suggest that it would be a departure from the "usual and ordinary" meaning of the term to conclude that the disparate investors who make up the Alsin Group truly comprise a "group."

For instance, Webster's Third New International Dictionary defines "group" as follows:

> 1: two or more figures ... forming a distinctive unit complete in itself or forming part of a larger composition ... 2a: a relatively small number of individuals assembled or standing together ...--compare CROWD b: an assemblage of objects regarded as a unit because of their comparative segregation from others (a of buildings) (a of towns ...) ... (1): a cluster of islands (the consists of four tiny islands) ... (2): a cluster of hits on a target fired with the same sight setting and the same point of aim 3: a number of individuals bound together by a community of interest, purpose, or function

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1004 (ed.1986).

> Merriam Webster's Collegiate Dictionary similarly defines "group" as 1: two or more figures forming a complete unit in a composition 2a: a number of individuals assembled together or having some unifying relationship b: an assemblage of objects regarded as a unit ... 3a: an assemblage of related organisms....

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 515 (10th ed.1994).

> The dictionary definitions attribute to "group" certain characteristics. *A "group" is, for example, a smaller, identifiable subset of a larger population, sharing a common, defining characteristic which serves to distinguish them from that larger population. The word, thus, means more than a mere random collection of unrelated individuals or things. For instance, when one refers to a "group" of buildings in a city, one generally is not speaking about all of the buildings in a city, but to a specific subset of buildings, like those located in a certain area, or those sharing a certain architectural feature.* Likewise, when one refers to a "group" of persons in a crowd, one generally would be understood to be referring to a specific subset of the crowd, for instance, individuals standing on a particular corner, or engaged in an activity in which the rest of the crowd is not participating.

*Id.* at 811-12 (footnotes omitted and emphasis added).   After examining the common meaning of the term "group," the district court turned to an analysis of the structure of the Reform Act in an attempt to tease forth a meaning of the term "group" consonant with its provisions.

Examination of the lead plaintiff provisions of the [Reform Act] reveals that they speak in the singular in all instances save one: the reference to "group of persons." In all other instances, the statute uses the singular "person." For instance, the "Restrictions on professional plaintiffs" section of the statute states that "a person may be a lead plaintiff . . . in no more than 5 securities class actions . . . during any 3- year period," 15 U.S.C. § 78u-4(a)(3)(B)(vi), but does not expressly impose such a restriction on a "group of persons." Without exception, these provisions of the [Reform Act] speak of a single plaintiff; on their face, they do not contemplate multiple plaintiffs. Other courts have made this same observation. See, e.g., *In re Milestone Scientific Securities Litigation*, 183 F.R.D. 404, 416-17 (D.N.J.1998) ("Significantly, apart from the sole reference to 'a group of persons,' the [Reform Act] is worded in the singular, providing a mechanism[] [for] the appointment of 'the most adequate plaintiff,' not the most adequate plaintiffs.").

At least one court has concluded that the statute's persistent use of the singular precludes both the appointment of co-lead plaintiffs and the appointment of a group comprised of a random assemblage of unrelated persons who are unable to function as a single, cohesive unit. "While the [Reform Act] refers to 'a person or group of persons' as capable of serving as the lead plaintiff, the surrounding statutory language forecloses the appointment of multiple groups or multiple persons not part of a cohesive group." *Id.* This Court agrees that the context and structure of the [Reform Act] evince an intent that a "group" consist of more than a mere assemblage of unrelated persons who share nothing in common other than the twin fortuities that (1) they suffered losses and (2) they entered into retainer agreements with the same attorney or attorneys.

The [Reform Act] does allow more than one person to serve as the lead plaintiff; it would be inconsistent with the [Reform Act's] facial disapproval of multiple plaintiffs, and its persistent use of the singular terms person and plaintiff, however, to allow a melange of unrelated persons to serve as the lead plaintiff, especially if multiple law firms are to represent their interests. Such a "group" would be a "lead plaintiff" in name only; in substance, those individuals would essentially constitute a collection of lead plaintiffs, unbound by any allegiance to one another and unlikely to function as a unified whole. In such circumstances, the Court would be left with little assurance that the "group" speaks with a collective voice.

*Id.* at 813. Finally, the court noted the limitations on control of counsel resulting from permission of aggregation of unrelated plaintiffs into groups:

> The larger the group, the less incentive any single member of the group — and certainly the group as a whole — will have to exercise any supervision or control over the litigation. In the case of a single plaintiff, the agency costs are those costs associated with the monitoring of and communication with the plaintiff's attorney by the individual plaintiff. Where more than one person is involved–whether it be in the context of a "group of persons" seeking to serve as lead plaintiff, or in the context of an attempt by various person to become co-lead plaintiffs –there is an additional cost associated with intragroup communication and monitoring. The greater the number of persons comprising the group, the more difficult it is for those persons to communicate with each other, and to speak with a single, coherent voice when making decisions about the conduct of the litigation, or, more precisely, the conduct of the attorney or attorneys in prosecuting the litigation. With the lead plaintiff group splintered and with no authoritative voice with which to exercise control over counsel, counsel is no more effectively controlled than in the pre-[Reform Act] era.
>
> *This is especially so if the group consists of not only a larger number of persons, but also of persons who bear no relation and have no connection with one another beyond the fact that they suffered financial loss as a result of a drop in the price of their shares of stock. Without some cohesiveness within the group, or something to bind them together as a unit, there is no reason for the individual members of the group to speak and act with a uniform purpose.* Aggregating claims simply for the purpose of creating the largest financial loss would do nothing to reduce the agency cost and collective action problems associated with the former regime. Aggregation in such instances will not change the fact that no one member of the "group" will have the financial incentive to monitor, and, because there is no reason for the individual members to act collectively (no structure for decision making, etc), the group as a whole will not engage in monitoring. Thus, the problem sought to be remedied by the [Reform Act's] lead plaintiff provisions would remain unaddressed.

*Id.* at 815-16 (emphasis added).

Because the eighteen members of the Alsin group were too many to provide control of the litigation and because those members had no pre-existing relation, the district court refused to appoint the Alsin Group lead plaintiff. *Id.* at 816. The court next

dispensed with FSBA as the most adequate plaintiff and turned its attention to the Hayman Group's motion for appointment as lead plaintiff. In severing the investment advisor from the Hayman Group and appointing the brothers lead plaintiff, the district court concluded the brothers "obviously have a pre-existing relationship and a basis for acting as a collective unit," with the consequence that they would "be able to speak with a single voice in their dealings with their chosen counsel." *Id.* at 823. This would not be the case if the investment advisor was left in the Hayman Group, the court determined, as "[h]e has no pre-existing relationship or association with the Hayman brothers." *Id.* The result in *Telxon* was completely followed in the later case of *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1154 (N.D. Cal. 1999) ("The court adopts [the *Telxon* court's] narrow view of the 'group' and 'plaintiffs' language in Section 21D.").

*Wenderhold v. Cylink Corp.*, 188 F.R.D. 577 (N.D. Cal. 1999), involved an unopposed motion for appointment of lead plaintiff by a group of seven plaintiffs. In deciding to single one investor out of the seven to appoint as lead plaintiff, the district court first noted the strong policy of the Reform Act against permitting attorneys to take control of securities class litigation and the frustration of that policy that would result if plaintiffs' groups consisting of unrelated persons were to be appointed lead plaintiff. *Id.* at 586. However, the district court, altering somewhat the view of earlier courts that required a pre-existing relation prior to aggregation, set forth two alternate scenarios under which aggregation into a small plaintiffs' group would be required:

> The first instance occurs if aggregation is necessary to address the existence of intra-class periods. If there is no single proposed plaintiff who has purchased in each intra-class period, a proposed plaintiff in one intra-class period may join with a class member or members who purchased in the other intra-class period(s) to form a group that would be entitled to the statutory presumption of superiority. Were aggregation not allowed in such an instance, the court would be forced to appoint as lead plaintiff an individual plaintiff whose limited interest in the

litigation renders him incapable of fairly and adequately protecting the interests of the class as a whole. Thus, representational concerns may mandate aggregation.

The second instance concerns the question of adequate litigant control over the litigation. Aggregation may be permissible if it can be shown to serve the [Reform Act's] effort to shift control of the litigation away from the lawyers and to the investors. This might be true if the aggregation could be shown to be more capable than any single plaintiff of exercising effective control over the litigation independent of the lawyers. Likewise, if appointment of co-lead plaintiffs is necessary to achieve the transfer of power away from attorneys and to litigants, such appointment may be appropriate. See *In re Oxford*, 182 F.R.D. at 45-47.

*Id.* The district court in *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d at 1154, considered *Wenderhold* an example of a limited aggregation case because of the two exceptions that the *Wenderhold* court attached to its anti-aggregation principle. However, this Court is of the opinion that *Wenderhold* is consonant with the anti-aggregation cases. Rather than permitting aggregation within reason, as the limited aggregation cases do, *Wenderhold* forbids aggregation except where it is necessary either to preserve representation of the class as a whole or when counsel can only be properly controlled by a group of investors. Essentially, *Wenderhold* permits aggregation of plaintiffs only in those cases where denial of aggregation would result in no fully adequate lead plaintiff being appointed.

*In re Network Associates, Inc., Securities Litigation*, 76 F. Supp. 2d 1017, follows the anti-aggregation trend. In *Network Associates*, two lead plaintiffs groups, each consisting of thousands of individuals, but led by relatively small "steering committees," and one individual investor filed opposing motions to appoint lead plaintiff, in a case characterized by invective and ill-will by both plaintiffs' groups. The district court, after a lengthy discussion of the Reform Act's purposes and history, concluded that neither group, or its "steering committee," should be permitted to serve as lead plaintiff. In deriving its conclusions, the court stated:

To be sure, the [Reform Act] . . . contemplates that a "group of persons" may qualify as the lead. The [Reform Act], however, equally contemplates that the court will select "the most adequate plaintiff" as the lead. The whole point of the reform was to install a lead plaintiff with substantive decisionmaking ability and authority. For example, a group of mutual funds managed by a single organization might qualify. It would have an internal coherency and would be capable of acting as a unified decisionmaker. A mass of unrelated investors could not do so. Were it otherwise, then a qualified institutional investor with the single largest loss could be trumped by a collage of individual investors with greater aggregate losses but no ability to manage the case. Congress plainly rejected that proposition.

Too, an incoherent group with no decisionmaking apparatus would be far too unwieldy to satisfy Rule 23. In the present case, for example, the competing groups did not even vote on the memberships of the subgroups suggested for reasons of "administration and efficiency." The subgroups were simply hand-picked by counsel and dressed up with names. Such unorganized groups of unrelated investors with nothing in common other than the lawyer and with no clear-cut mechanism for making decisions could not "fairly and adequately" carry out the responsibility to protect the interests of the class.

*Id.* at 1025. The district court next quoted the Amicus Brief submitted by the SEC to the Eleventh Circuit Court of Appeals in *Parnes, et al., v. Digital Lightwave, Inc.*, at 12, 15, No. 99-11293 (11th Cir. Aug. 25, 1999):

*To enable the court to assess whether the proposed group is capable of performing the lead plaintiff function, it should provide appropriate information about its members, structure, and intended functioning.* Such information should include descriptions of its members, including any pre- existing relationships among them; an explanation of how it was formed and how its members would function collectively; and a description of the mechanism that its members and the proposed lead counsel have established to communicate with one another about the litigation. *If the proposed group fails to explain and justify its composition and structure to the court's satisfaction, its motion should be denied or modified as the court sees fit.*

*Id.* at 1026 (emphasis added). The district court, applying the criteria set forth by the SEC, then denied the motions of the two plaintiffs' groups to be appointed lead counsel. *Id.* 1026-27.

In the most recent published case, the district court in *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d at 853, followed the trend started by *Texlon*, but appeared to accept the exceptions to the anti-aggregation principle set forth in *Wenderhold*:

> [T]here may well be a few situations in which a small group might provide more effective oversight of class counsel than any single investor. The [Reform Act] gives courts the discretion to take such an approach if that seems reasonable based on the information the court has about the volunteers for lead plaintiff or perhaps because of significant differences of claims arising at different times in a longer class period. Nevertheless, this court sees no benefit in giving any weight to a mechanical aggregation of the losses of investors as a "group of persons" whose only connection is their common losing investment.

*Id.*

From an examination of the cases discussed above and the reasons given therein, it is clear that both the statutory language and goals of the Reform Act disallow agglomeration of large plaintiffs' groups to act as lead plaintiff. The phrase "group of persons," as informed by both common usage and statutory structure means something other than an unrelated mass of persons whose common features are loss and counsel. See *In re Telxon Corp. Securities Litigation*, 67 F. Supp. 2d at 811-13.

Further, the exercise of control by plaintiffs over their counsel envisioned by Congress in enacting the Reform Act is defeated by permissive aggregation. Permissive aggregation limits incentives to monitor counsel, as most members of plaintiffs' groups have small losses in comparison with the costs of monitoring the attorneys. This incentive is lessened further through the free-rider problem, as many plaintiffs will expend little or no money monitoring their counsel and what money is spent in monitoring of counsel may be wasted on duplicative exercises of oversight. In addition, the larger the

group, the greater the costs; monitoring of counsel requires that group members all have relevant information regarding actions of counsel and are able to make group decisions. However, communication and decisionmaking costs among plaintiffs rise tremendously as group size increases.

Aside from the problems raised by the lack of incentives for monitoring, there exists the problem that counsel can take advantage of the size of the group to insure that it controls the major decisions of the litigation. Intra-group conflicts are certain to arise. Counsel can seize upon those conflicts, choosing sides with the subgroup most favorable to its own interests, thereby adding "an extra imprimatur of authority to the position of the lead plaintiffs with whom the lawyers agree," and effecting the litigation in one direction or the other. Heck, *Conflict and Aggregation*, 66 U. Chi. L. Rev. at 1221. Also, with larger groups come fewer informed investors. Such investors are more likely to obtain information about the action through the filter of counsel's self-interest and would tend to rubber-stamp counsel's decisions.[54] A lead plaintiff group consisting largely of small, irregular investors would therefore be led by counsel that navigates the course, stands at helm and steers the rudder; the lead plaintiffs' group would merely pull the oars.

This being the case, the Court will not permit the Group, defined as the aggregation of almost three hundred investors led by a steering committee of twelve, to serve as lead plaintiff in the instant action. Beyond the reasons given, the court further notes that it is less than clear whether all of these two hundred and ninety-eight individuals are even aware that they are part of a lead plaintiffs' group. The Court has serious reservations about awarding the lead plaintiff mantle to an investor or body of investors where the veracity of the representations made in the certifications filed by that

---

[54] In some sense, this is a recharacterization of the problems related to costs of monitoring counsel, as among such costs are the costs to the class members of educating themselves about the action and the general extent of the relevant law.

investor or body can be questioned. Arguable problems with the certifications appended to the Group's motion raise the question of whether each investor who filed a certification is willing to serve as lead plaintiff. To assure itself that every individual or investor who provided a certification actually desired to serve as lead plaintiff, the Court believes that it would be required to hale each investor submitting a certification or its representative into court to ask him or her whether the investor understands what the responsibilities of a lead plaintiff are and whether that investor is willing to perform those duties. This, pragmatically speaking, would be a nightmare exercise, postponing the lead plaintiff determination through months of hearings, all the while wasting valuable resources of both those investors and the court.

Even if the Group is defined simply as the twelve individuals who lost approximately $2.6 million dollars, this Court does not believe aggregation is appropriate, as under either a limited aggregation or anti-aggregation approach, there are simply too many unconnected investors among the twelve. Both approaches are concerned with insuring that the lead plaintiff controls its counsel and with maximizing that control, except when class representation is hampered. See *Wenderhold v. Cylink Corp.*, 188 F.R.D. at 586; *In re Telxon Corp. Securities Litigation*, 67 F. Supp. 2d at 815-16; *In re Party City Securities Litigation*, 189 F.R.D. at 114; and *In re Baan Co. Securities Litigation*, 186 F.R.D. at 217. Under either a limited aggregation or anti-aggregation approach, a proposed plaintiffs' group must, at a minimum, be capable of justifying how the benefits to be gained by aggregation offset any dilution of that group's control over the class. That is, for each additional class member added to a group over one (starting with the most qualified investor), there must be a benefit to the group or class that equals or outweighs any loss of control.

Here, the Group, narrowly conceived, has put forward nothing to assure this Court that the presence of twelve investors in the Group confers a benefit to the class

rendering it better suited to represent the class than an eleven-investor group, nor that an eleven-investor group would be better than a ten-investor group, and so forth. Further, control problems are brutally apparent even in the structure of the narrower Group. First, that Group is spread across the country, making it somewhat troublesome and potentially expensive for Group members to communicate and discuss decisions to be made on behalf of the purported class. Second, there appears to be no means of resolving conflict among Group members, as would be necessary for those members to speak with a unified voice. Finally, there is no explanation of how the conduct of the attorneys is to be monitored by the Group and who is to bear the expense of that monitoring.

Mostly, the Group's arguments are negative; it attempts to demonstrate the presumptive inadequacy of SWIB, hoping thereby to be the only remaining choice. The only offered justification for appointment of the Group is that of "diversity." But, as has been often noted, diversity is not, in and of itself, a value inherent in the Reform Act. See *In re Party City Securities Litigation*, 189 F.R.D. at 113. Having diverse plaintiffs in a lead plaintiff group must serve a tangible goal that furthers the representative adequacy of that group. The Group, not having disclosed what the tangible goal of diversity in this action might be, will not be considered as an entity for purposes of determining most adequate plaintiff.

The Court will not refuse the individual members of the narrower Group consideration as most adequate plaintiff, however. It simply will not consider the adequacy of those individuals as summed together in a contrived plaintiffs' group.

**Determination of adequacy.**

"To encourage the selection of an institutional investor as the lead, the [Reform Act] . . . creates a rebuttable presumption concerning which class member is most capable of adequately representing the interests of class members." *In re Network Associates, Inc., Securities Litigation*, 76 F. Supp. 2d at 1021. Subsection 21D(a)(3)(B)(iii)(I) of the Exchange Act sets forth the manner in which this rebuttable presumption of adequacy is to be established:

> (I) In general
> Subject to subclause (II), for purposes of clause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that--
>> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The presumption can be rebutted by proof offered by a class member that the presumptively most adequate plaintiff would not "fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Courts have struggled with the relation of subsection 21D(a)(3)(B)(iii)(I) of the Exchange Act to subsection 21D(a)(3)(B)(iii)(II) of that Act, particularly with respect to the interaction of the Rule 23 adequacy and typicality determinations to be made under subsection 21D(a)(3)(A)(iii)(I)(cc) and the adequacy and typicality determinations to be made under subsection 21D(a)(3)(A)(iii)(I). For example, the district court, in *In re Telxon Corporation Securities Litigation*, 67 F. Supp. 2d at 817 n.23, described the perplexing interrelation of the two provisions:

> It is unclear why the drafters of the [Reform Act] included this precise same prerequisite at two different stages in the lead plaintiff analysis. Perhaps it was an oversight. Perhaps the first inquiry is merely a threshold inquiry and the second is meant to be a comparative inquiry (i.e., who among the proposed lead plaintiffs, who may have identical losses, is the most adequate). Whatever the reason, the fact of its repetition evidences the importance of the adequacy requirement.

The SEC, in its amicus brief filed in *LaPerriere v. Vesta Insurance Group, Inc., et al*, CV 98-AR-1907-S, on September 24, 1998, subsumed the adequacy and typicality determinations to be made under subsection 21D(a)(3)(B)(iii)(I)(cc) to those required under subsection 21D(a)(3)(B)(iii)(II), placing the full onus of demonstrating the inadequacy or atypicality of a presumptive lead upon a dissatisfied class member. In its brief, the SEC stated:

> The Act establishes specific standards for an adequacy challenge. In relevant part, the Act provides that the presumption in favor of the most adequate plaintiff "may be rebutted *only upon proof* by a member of the purported plaintiff class that the presumptively most adequate plaintiff * * * *will not* fairly and adequately protect the interests of the class." 15 U.S.C. [§] 78u-4(a)(3)(B)(iii)(II) (emphasis added). Thus, *mere speculative allegations of inadequacy are not sufficient.* As one court noted, "speculative assertions are insufficient to rebut the presumption that [a lead plaintiff movant] is the most adequate plaintiff. The statute requires the [challenger] to present 'proof' of its assertions; or if it requires discovery to gather such proof, to 'demonstrate a reasonable basis' for a finding of inadequacy." *Gluck*, 976 F. Supp. at 547-48 (citing 15 U.S.C. [§] 78u-4 (a)(3)(B)(iii)(II) & (a)(3)(B)(iv).

SEC Brief at 29-30 (emphasis in original).

*Chill v. Green Tree Financial Corp.*, 181 F.R.D. at 408 & 411, departs with both the *Telxon* and SEC positions on the matter. In *Chill*, the district court treated subsections 21D(a)(3)(B)(iii)(I) and 21D(a)(3)(B)(iii)(II) as imposing two separate requirements upon lead plaintiff contenders. Under that court's rationale, the former subsection requires a lead plaintiff movant to affirmatively demonstrate that he, she, or it filed a complaint or motion to be appointed lead plaintiff, possesses the largest financial interest and sufficiently satisfies the requirements of Federal Rule of Civil Procedure 23. The later

subsection the court treated as a rebuttal provision, requiring an opponent of a presumptive lead plaintiff to demonstrate that the presumptive lead plaintiff either is not a typical class member or is an inadequate representative of the purported class.

Resolving the interplay between subsections 21D(a)(3)(B)(iii)(I) and 21D(a)(3)(B)(iii)(II) is a difficult task and there exist fair arguments in support of each explicitly drawn position. However, the Court must make a decision on how to interpret these provisions if it is to apply them. Thus, this court, respectfully departing from the positions of the *Telxon* court and the SEC, will not read a redundancy into subsections 21D(a)(3)(B)(iii)(I) and 21D(a)(3)(B)(iii)(II) by interpreting those sections to pass only once over the issues of adequacy and typicality. See *Connecticut National Bank v. Germain*, 503 U.S. 249, 253 (1992); *Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (citing *Colautti v. Franklin*, 439 U.S. 379, 392 (1979), in recognition of "'the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative. . .'"); *In re Griffith*, — F.3d —, 2000 WL 305458 at *4 (11th Cir. 2000) (noting, among canons of statutory interpretation, that courts should avoid interpreting statutes such as to render language in the statute superfluous); *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999) ("We assume that Congress used the words in a statute as they are commonly and ordinarily understood, and we read the statute to give full effect to each of its provisions."); and *Doctors Hosp., Inc. of Plantation v. Bowen*, 811 F.2d 1448, (11th Cir. 1987) (noting the statutory canon of "giving effect, when possible, to every word Congress employs"). Rather, this Court views these two subsections as serving different, but complementary roles. As more specifically explained below, the subsections require a district court to consider the typicality and adequacy of a lead plaintiff contender as class representative in the first instance when it weighs those, among other, factors to choose the most adequate plaintiff, or to rank the contenders

from least to most adequate plaintiff, and in the second instance when a class member seeks to knock out a presumptive most adequate plaintiff.

In light of the text of the statute and its purpose, as inferred from the structure of the statute and its legislative history, this Court concludes that, rather than acting as a set of absolute threshold requirements, subsection 21D(a)(3)(B)(iii)(I) is a comparative subsection, obligating the court to weigh the factors set forth therein in determining lead plaintiff. A lead plaintiff movant, to be presumed most adequate plaintiff, need not demonstrate that it satisfies each of the prerequisites, but merely that he, she, or it *best* satisfies the factors listed. Put differently, the subsection creates a multi-factor test, rather than a bright-line test, for determining most adequate plaintiff. One reason for this conclusion is that there exists no fallback position from the subsection 21D(a)(3)(B)(iii)(I) presumption of adequacy. If the subsection required a presumptive lead plaintiff to meet a certain threshold, then, were no lead plaintiff contender capable of meeting all of the subsection requirements, there could be no lead plaintiff and, therefore, no one to prosecute the suit.[55]  For example, if the requirements contained in subsection 21D(a)(3)(B)(iii)(I) were absolute threshold requirements, then a contender who suffered the greatest financial loss, but did not satisfy other of the requirements of that subsection could not be named lead plaintiff. Further, nor could anyone else, as no one else could have the largest financial interest.[56]  Second, the provisions of subsection

---

[55]  Although the argument could be made that the first plaintiff to file an action would be appointed lead plaintiff as a fallback if no other movant could satisfy absolute lead plaintiff criteria, this too would be in error. First, as is clear from the legislative history discussed, Congress did not want a first-to-file rule to govern the determination of lead plaintiff in any manner. Second, on the rejected threshold reading, subsection 21D(a)(3)(B)(iii)(I)(aa) includes those plaintiffs who file a complaint among those who may be disqualified for not meeting the presumptive requirements.

[56]  This problem for the threshold position would arguably be resolved if the factors contained in subsection 21D(a)(3)(B)(iii)(I) were ranked such that greatest financial loss, or typicality, or adequacy, was the most important virtue of an adequate lead plaintiff, but no such

21D(a)(3)(B)(iii)(I) are couched, either literally or of necessity, in comparative terms,[57] except arguably, subsection 21D(a)(3)(B)(iii)(I)(aa).[58]

Subsection 21D(a)(3)(B)(iii)(II), by contrast, is a "knock-out" provision, permitting another class member to utterly disqualify the presumptively most adequate, or highest ranked, contender "upon proof that the presumptively most adequate plaintiff" is actually (rather than may be) an inadequate representative or "subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-

---

lexical ordering is put forward in the language of the statute. However, it could be argued, Congress did consider largest financial interest to be the central part of any most adequate plaintiff analysis, as the plaintiff with the largest financial interest was presumed to be the investor most motivated to obtain relief beneficial to the class members. Nonetheless, were Congress's preference for the plaintiff with the largest financial interest in the litigation used to support a lexical ordering of the factors in the subsection, the other factors would only become important in the case of a tie between two competitors with an equally large financial loss. It is doubtful that Congress intended the other factors listed to act simply as tie-breakers in extremely rare cases. Rather, the largest financial interest factor is the centerpiece of any most adequate plaintiff analysis.

[57] Subsection 21D(a)(3)(B)(iii)(I)(bb) speaks of the "largest financial interest," requiring comparison among other lead plaintiff contenders. An argument could be made that the language in subsection 21D(a)(3)(B)(iii)(I)(cc) is absolute, requiring lead plaintiff contenders to meet the requirements of Rule 23. However, were that subsection to be read in absolute terms, it would render subsection 21D(a)(3)(B)(iii)(I) a nullity, in violation of accepted canons of statutory construction.

This Court further notes that it is not taking a controversial position. District courts have consistently appointed as lead plaintiff individuals who do not meet all of the requirements of the subsection. The Court here merely spells out the reasoning behind this practice.

[58] However, the Court is of the opinion that this provision is also comparative in nature. A putative class member who files a certification under subsection 21D(a)(2)(A) but who does not make a motion to be appointed lead plaintiff (such as the members of the Group, narrowly conceived), nonetheless may be deemed most adequate plaintiff under subsection 21D(a)(3)(B)(iii)(I). Although the investor did not file a motion or complaint, but only a certification, the Court may consider him, her, or it for the lead plaintiff position. The only negative consequence of failure to file a complaint or a motion to be appointed lead plaintiff is that the investor may not be evaluated as highly as a lead plaintiff contender who did file a complaint or motion to be appointed lead plaintiff.

4(a)(3)(B)(iii)(II).[59]  In so concluding, this Court follows what it perceives to be the interpretation of this subsection by the SEC and other district courts.

With this in mind, this Court concludes that the "knock-out" provision of subsection 21D(a)(3)(B)(iii)(II) is inapplicable to the present action, as no party has presented proof that any other contender labors under a presently existing and ascertainable adequacy or typicality problem of a serious nature.  Rather each movant points only to *potential* Rule 23 problems that the other may have.  As such, potential adequacy and typicality problems are factors to be considered in determining which competitor is presumptively the most adequate plaintiff.

All that the statute requires of a court in determining the presumptive most adequate plaintiff (and, for purposes of this action, the most adequate plaintiff), is to weigh and balance the listed factors and choose the class member whose characteristics best comport with those factors.  For pragmatic reasons, though, it will be helpful in some circumstances to rank the contenders from the most to least suited to assume the role of lead plaintiff.  For example, where there exist attempts by various lead plaintiff contenders to knock-out higher-ranked lead plaintiff contenders, it is useful to rank movants in order that the court can find the most adequate plaintiff easily after the "knock-out" provision is applied.  Other instances in which the employment of a ranking of adequate plaintiffs is useful occur when it is appears that no lead plaintiff contender best satisfies all of the requirements of subsection 21D(a)(3)(A)(iii)(I) or when it appears that no lead plaintiff contender can be representative plaintiff for all intra-class periods. This later concern motivates the Court's decision to rank the contenders in this action.

---

[59]  Under this Court's reading of section 21D(a)(3)(B)(iii)(I)(cc), the Court is to evaluate only whether possible Rule 23 problems exist or may develop, based upon a movant's filed certification and supporting documents, in the determination of most adequate plaintiff.

**SWIB.**

Four factors have been found commonly relevant to the determination of "largest financial interest" under subsection 21D(a)(3)(A)(iii)(I)(bb): (1) the number of shares purchased by the movant, (2) the number of net shares purchased by the movant, (3) the total net funds expended by the movant during the class period and (4) the losses suffered by the movant. See *First Merchants Acceptance Corp.*, 1997 WL 461036 at *5 (N. D. Ill. 1997). In the instant action, having purchased 2,391,000 shares on which it sustained a total loss of $23,405,967.14, SWIB clearly has the largest financial interest of the lead plaintiff competitors. Further, from the period extending from August 13, 1999, until September 15, 1999, SWIB clearly typifies the investor in Feet stock. While SWIB may owe primary allegiance to its beneficiaries, the Court does not see that primary loyalty as a strike against SWIB's ability to adequately represent the class during the above described time period. Nonetheless, the Court has reservations about permitting SWIB to act alone as lead plaintiff for the putative class. Given that it sustained no losses during the period prior to August 13, 1998, SWIB has a strong disincentive to prosecute this action for that earlier period. Fraud proven during the earlier period does not inure to SWIB's benefit; rather, for SWIB, attempting to prove earlier fraud will be a wasteful expenditure of resources. Further, SWIB has only limited interest in pursuing fraud claims arising from actions taken in the final six weeks of the class period, when the value of Feet stocks ranged from $2 to $1.50; its focus in the action would reasonably be on proving earlier instances of fraud, both because it will have an easier time demonstrating that the fraud caused its damages and because its earlier losses proportionally overwhelm the later losses.

**Michael.**

Michael is perhaps the second most adequate plaintiff. Among the members of the "steering committee" of the self-styled Group, he has, under a conventional approach, the largest financial interest, having suffered losses of $311,133.07 on a total of 94,950 shares purchased by him. While, for the most part, Michael's purchases overlap with those of SWIB, making many of his claims of adequacy subservient to those of it, Michael made several purchases during the last six weeks of the class period, when the value of the stock was low, and has the strongest interest in prosecuting claims during that period.

**The Bushes.**

The Bushes, also alleged members of the Group, are the next most adequate plaintiffs, having lost a total of $304,382.8225 on trades made throughout the class period, except during the last six weeks. Were it not that the Bushes had a financial interest substantially lower than SWIB, they would likely be most suited to serve as most adequate plaintiff in the action. There is nothing to indicate that they would not be typical and adequate representatives of the class for the extent of the class period, excluding the final six weeks. Finally, the Bushes have demonstrated a keen interest in the progress of this action, along with Eubank being the only member of the "Group" attending the Court's scheduled March 6, 2000, hearing.

**Eubank.**

After the above listed three, the qualifications of almost all the other lead plaintiff contenders drop off significantly, being eclipsed either by the losses sustained by the other contenders or by the other contenders' ability to better serve the class for a more comprehensive period of time. However, Eubank presents a peculiar case, for three reasons. First, as a percentage of net worth, he clearly has the largest financial stake in this litigation, supporting a strong desire to obtain a recovery that best recompenses him

for his losses. In an unconventional sense based upon loss as a proportion of overall wealth, Eubank has the largest financial interest in the litigation, supporting an interest in receiving a substantial recovery. Also, because of his greater percentage losses, Eubank may be the class representative best suited to bring a claim to recover via joint and several liability for recklessness. Finally, as with the Bushes, Eubank has shown a strong interest in following the proceedings in this action.

The Court earlier noted that for a group or committee of investors to be appointed lead plaintiff, the benefits inuring to the class from aggregation for the addition of each new group member must outweigh any concurrent loss in control over lead plaintiff's counsel. Each addition of Michael, then the Bushes, then Eubank, to SWIB in a committee acting as lead plaintiff shores up holes in the representation of the class occurring without such addition. Further, each addition does not appear likely to result in a significant loss of control by plaintiffs over the litigation. Thus, the benefits to the class of requiring SWIB and these three individuals to act as a committee outweigh any attorney control problems that would ensue from the appointment. Therefore, the Court will appoint as lead plaintiff a committee consisting of SWIB, Michael, the Bushes (one vote), and Eubank. All decisions reached by the lead plaintiff committee must be made by consensus — that is, by *unanimous* decision. If the committee has consistent problems in reaching consensus decisions such that the benefits ensuing to the class from the joint representation are eroded, the Court will consider either paring the committee or restructuring it such that those problems cease to be. Further, members of the committee should be aware that permanent appointment to the committee is contingent upon no more adequate plaintiff coming forward to claim a position or positions on that committee after proper notice is published. Finally, at all committee meetings, there should be one, and at most two, representatives of SWIB present. Further, unless that

individual leaves his or her position with SWIB, the representative(s) of SWIB shall be the same for *every* meeting.

All members of the committee are expected to closely follow this action and educate themselves in order that they may make informed and intelligent decisions about the progression of this action. The members of the committee are also required to hold, at least once a month, a meeting to discuss the progress of the litigation and make decisions about its direction. Except for a biannual meeting to be held in Birmingham, Alabama, all meetings after the appointment of lead counsel may be conducted by telephone.

On or before Friday, April 21, 2000, the members of the committee shall meet in person at a location of their choosing within the Birmingham, Alabama metropolitan area. If the members cannot decide on a locale, or if it is easier for the committee members to do so, they may meet in Courtroom 5B of the Hugo L. Black U.S. Courthouse. If the members wish to use the courtroom, they should call Frances Stimpson (my secretary) between 9:00 a.m. and 5:00 p.m., Monday through Friday to reserve an available time. Ms. Stimpson's telephone number is (205)278-1982.

At this meeting, committee members are first to elect a spokesperson for the committee and decide upon operating principles for the committee such as delegations of duties, formats for discussing issues of dispute, and the like. The Court would suggest that SWIB's representative at the meeting be appointed spokesperson, given SWIB's extensive past experience at overseeing securities class action litigation. After, and only after, resolving these matters, the committee is to decide its choice for lead counsel in the action. The Court advises that the committee choose no more than two law firms to actively prosecute the action and, if necessary, no more than two law firms to act as liaison counsel (i.e., local counsel). The committee is also advised to heed the overarching theme of this opinion, that it is to control the lawyers, not the other way around, in

choosing counsel. The Court reiterates that any decision made by the committee is to be made *unanimously*.

The Court notes that this is a meeting of the committee members to consider and recommend to the Court appointment of lead counsel. It is a meeting of the committee and not a meeting of attorneys. However, if *absolutely necessary*, each of the individual committee members may choose one attorney to represent him or her at the meeting as well.

Within five days of making its choice of preferred lead counsel, the committee shall file a motion in support of its choice as lead counsel, along with a statement detailing the proposed billing arrangements of offered lead counsel, attorney or firm resume(s) of that counsel, and other materials detailing counsel's experience in securities class action matters. Within five days thereafter, any excluded attorney or law firm may file an objection to the committee's choice of lead counsel and file with the objection any supporting documentation. Upon making the determination of lead counsel, the Court will set forth a schedule under which an amended complaint is to be filed, notice is to be published, and answers or motions to dismiss are to be filed.

CONCLUSION

As set forth herein, the motion of SWIB to be appointed lead plaintiff filed on January 18, 2000 (Document 29), will be GRANTED in part and DENIED in part.  The motion of the Just for Feet Plaintiffs Group to be appointed lead plaintiff filed on January 18, 2000 (Document 32), will be DENIED.  The motion for reconsideration filed by SWIB on March 2, 2000 (Document 71), will be GRANTED, in part, and DENIED, in part.  The motion in opposition to SWIB's motion for reconsideration will be DENIED (Document 73).  SWIB (one vote), Kenneth P. Bush and Louise M. Bush (one vote), Edward E. Eubank (one vote), and John Michael (one vote) will hereby be APPOINTED to a lead plaintiff committee.  Any person or institution not wishing to serve as a member of the committee shall so inform the Court on or before Friday, April 21, 2000.

DONE and ORDERED this ____ day of April, 2000.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE